VIRGINIA FOODS OF BLUEFIELD, VA., INC.

*v.*

RICHARD L. DAILEY, *etc.*

(No. 13766)

Decided December 20, 1977.

---

*Jackson, Kelly, Holt & O'Farrell, Thomas N. Chambers and Louis S. Southworth, II, Kwass, Stone & McGhee, Sidney J. Kwass,* for appellant.

*Chauncey H. Browning,* Attorney General, *Clovis D. Kuhn,* Assistant Attorney General, for appellee.

McGraw, Justice:

This case is before this Court on appeal from a final judgment of the Circuit Court of Mercer County by which that court sustained the State Tax Commissioner's assessment of Business and Occupation Taxes against Virginia Foods of Bluefield, Virginia, Inc., for the tax years 1968-72, inclusive, levied pursuant to *W.Va. Code,* 11-13-2c; and *W.Va. Code,* 11-13-2c,[1] amounting to $44,809.22, based on a finding that the in-state activities of Virginia Foods were substantial with relation to the establishment and maintenance of sales and were such as to provide a sufficient nexus for the levy of Business and Occupation Taxes.

This litigation brings here two important questions under West Virginia's Business and Occupation Tax stat-

---

[1] The statutory provisions governing this case and pursuant to which the Business and Occupation tax was imposed are:

*W.Va. Code,* 11-13-2 provides in pertinent part:

"There is hereby levied and shall be collected annual privilege taxes against the persons, on account of the business and other activities ... in the amounts to be determined by the application of rates ... against gross income as set forth in ..." [§§ 11-3-2a to 11-3-2k].

*W.Va. Code,* 11-13-2c in pertinent part reads:

"Upon every person engaging or continuing within this state in the business of selling any tangible property whatsoever. ...."

*W.Va. Code,* 11-13-1 defines these terms in our Business and Occupation Tax statute as follows:

" 'Business' shall include all activities engaged in or caused to be engaged in with the object of gain or economic benefit, either direct or indirect.

" 'Selling at wholesale' or 'wholesale sales' shall mean and include: (1) sales of any tangible personal property for the purpose of resale in the form of tangible personal property. ...."

ute which arose as a result of an audit conducted by an examiner of the Business Tax Division of the State Tax Department.

The issues as agreed on by the parties, are: (1) whether a foreign corporation having no warehouse, stock of goods, office or property located in West Virginia is liable for the West Virginia Business and Occupation Tax on gross receipts on all sales made by it which were solicited in West Virginia by salesmen working out of Virginia, accepted in Virginia, filled with a stock of goods in Virginia and subsequently delivered into West Virginia, and (2) if so, whether the taxation of such sales in interstate commerce is prohibited by the Commerce Clause of the United States Constitution.

Virginia Foods, a Virginia corporation, (hereinafter referred to as company or taxpayer), is a distributor or wholesaler of groceries and related products customarily marketed in grocery stores with its sole place of business in Tazewell, Virginia, near the town of Bluefield, Virginia, with customers located in portions of West Virginia, Virginia and Kentucky. The company has no warehouse or stock of goods, maintains no office or records, and is not qualified to do business in the State of West Virginia. It was agreed by taxpayer and the tax department, during the course of the audit, that out of the total sales made each tax year in West Virginia and Virginia, 46.8% were attributable to sales in this state.

Taxpayer solicits sales of food products in West Virginia through three sales representatives who work out of the Virginia home office. Orders for food items are sometimes made by use of a catalogue furnished monthly to each customer and updated with revisions on a weekly basis. Each catalogue contains the customer's name, an index, instructions for ordering and numerous perforated "tear sheets." Customers normally order food items once a week by tearing out and mailing the "tear sheets" to taxpayer's home office in preaddressed envelopes supplied with each catalogue. Sometimes food or-

ders are given to the sales representative for delivery to the home office, when the sales representative is in the customer's store on the date the order is ready to be sent.

Upon receipt of the order by taxpayer, it is either accepted or rejected based on whether the customer has paid his bills for the previous week or has a good credit rating. Food items so ordered are then loaded on company-owned trucks at the company's warehouse in Virginia, and the trucks are then dispatched from the warehouse for delivery to the customer in West Virginia.

Taxpayer also employs one non-food representative who works exclusively in this state, and a second non-food representative who works in portions of West Virginia and portions of Virginia. These representatives periodically visit grocery stores in West Virginia, inventory the non-food items on the customer's shelves, such as, non-prescription drugs and toilet articles, and they generally make out an order form for authorization by the management of the store.*

Orders for non-food items are handled in a manner quite similar to orders of food items, since all orders for non-food items are subject to approval by the home office in Virginia, and all goods are delivered from taxpayer's warehouse in Virginia by company-owned and maintained trucks. Non-food items are sometimes delivered along with the food items, and on other occasions separately and in separate vehicles. Taxpayer remains responsible for all goods until delivery is made and accepted, at which time title to such goods passes to the buyer.

Taxpayer is also a distributor and franchising agent for a grocer's alliance or cooperative known as the Independent Grocer's Alliance, commonly referred to as I.G.A., which has its headquarters in Chicago, Illinois. The taxpayer solicits and issues franchises to individual

---

* On some occasions the racks or shelves containing non-food items are refilled by the taxpayer's representatives.

store owners in West Virginia.[2] When an existing or pro-

---

[2] Pursuant to court request during argument, counsel provided the Court a copy of the Retailers Franchise used by Virginia Foods in connection with I.G.A. franchising in the state.

It provides in substance:

IGA RETAILERS FRANCHISE
AND
COOPERATIVE MERCHANDISING PLAN

Cooperation Built America ...   Cooperation Will Preserve It ...

WHOLESALER WILL

(A) Enroll Retailer as IGA Member which provides—

1. Store engineering service
2. Planned merchandising program for volume and profit
3. Weekly merchandising bulletins
4. Complete advertising program.
5. Weekly window posters and special sales material.
6. "Grocergram" magazine monthly.
7. Meat Merchandising program.
8. Produce merchandising program.
9. Printed order form
10. Chain store price check weekly to keep retailers posted.
11. Retail sales franchise for IGA products.
*12. Store Accounting Service.
13. Store Supervision.
14. Management Counsel and Personnel Training.

(B). Invoice all merchandise and supplies at Wholesaler's FOB warehouse cost-subject to conditions outlined.

RETAILER WILL

1. Lease and erect official I.G.A. sign.
2. Modernize store exterior according to I.G.A. specifications.
3. Modernize interior of store in accordance with I.G.A. recommendations.
4. Co-operate with retail price program.
5. Buy weekly using order form provided.
6. Have order form in wholesaler's office at specific time.
7. Send in signed check with order.
8. Assist driver in unloading.
9. Participate in group advertising program and pay his proportionate share.
10. Arrange merchandise in accordance with I.G.A. recommendations.
11. Install retail accounting program.
12. Participate in perishable program.
13. Maintain store in accordance with IGA standard for cleanliness and sanitation.
14. Subscribe to electronic order system (Eli).

spective independent grocer is interested in possible I.G.A. membership, he is invited to taxpayer's Virginia offices for a complete explanation and orientation as to the benefits and advantages of affiliation, as well as for an explanation of the standards and requirements governing the operation of any I.G.A. franchise.

If after this initial meeting the potential I.G.A. store owner is still interested in affiliation, then petitioner arranges for a meeting with representatives of large food manufacturers who assist the potential store owner in setting up his I.G.A. store. These meetings also occur in Virginia.

If affiliation is desired, taxpayer prepares at its Virginia offices instruction plans for the future store showing various product locations and the like. Representatives of taxpayer generally will go to the place where the business will be opening and assist the local merchant in establishing the business. If the grocer operates an existing established business, taxpayer provides store layout plans and other materials neccessary for a conversion to an I.G.A. store. After a franchise is established, taxpayer may provide counseling service as to

---

Membership under IGA Plan may be cancelled by either party by giving notice in writing thirty days in advance. In said event Retailer will cease to represent his store as an IGA store.

If this Membership is cancelled Retailer agrees, at his expense, to remove all IGA signs and insignia within thirty days. Title of all signs and insignia remains with IGA Supply Depot as per lease agreement.

It being evident that practical, workable and sincere co-operation between Wholesaler and Retailer is essential and necessary in order that food distribution or retail may be more efficient, economical and competitive.

And,—that such co-operation and mutual assistance protects and insures free enterprise and Independent Ownership of the grocery business.

And,—having read the detail of the IGA Plan, I hereby subscribe to its conditions and provisions, pledge my co-operation and support, and make application for membership.

The record indicates Virginia Foods did not provide or agree to provide payroll and accounting services, Item A-12, during the tax years in question.

the management and operation of the store. As a part of the franchise, member stores are provided promotional material, such as, signs advertising specials and display items of various types. Additionally, members are leased I.G.A. store signs which, although paid for by the individual grocer, remain the property of I.G.A. In this regard, taxpayer makes collections for the I.G.A home office. And as a franchisee, the customer is entitled to order I.G.A. brand name items from taxpayer.

# I

This Court's pronouncement in *Baton Coal Company v. Battle* 151 W. Va. 519, 153 S.E.2d 522 (1967) established that a person or corporation is not per se exempt from taxation under the West Virginia Business and Occupation Tax by virtue of the fact that its offices and principal place of business are not located in this state.

As *Baton* was a case of first impression involving the application of the Business and Occupation Tax to a foreign corporation with no place of business or office in this state, we refrained from attempting to formulate any inflexible rule. Rather, we simply held that whether a person is engaging in business within this state "depends on the facts and circumstances," of each particular case. *Id.* at 524, 153 S.E.2d at 525.

The taxpayer in *Baton* had its principal office and place of business in Pittsburgh, Pennsylvania and was engaged in the business of providing managerial services and advice to coal mining companies in Pennsylvania and West Virginia. During the tax years in question, it managed the operations of one company in West Virginia pursuant to written contract. In the performance of its contractual obligations, the corporation's representatives, none of whom were West Virginia residents, spent only 15 percent of their working days in this state. On these facts this Court held:

> "A Pennsylvania corporation, engaged in the business of furnishing managerial services and advice to coal mining companies from its offices

and place of business in Pittsburgh, which owns no property and has no place of business in West Virginia, but which, pursuant to a contract, furnishes managerial services and advice to a company engaged in the operation of a coal mine in West Virginia, is not engaging or continuing in business "within this State" within the purview of Code, 1931, 11-13-2 and 11-13-2h, as amended, and is not subject to taxation under that statute, notwithstanding the fact that some of its officers and agents, all residents of Pennsylvania, come into this state from time to time as an incident of furnishing the managerial services and advice, where it appears that the activities of such officers and agents while physically present within this state constitute a relatively minor part of the overall managerial services and advice furnished to the West Virginia coal mining company.

. . . .

"We merely decide that, in view of the comparatively meager business activity of Baton within West Virginia in the tax years in question, performed incidentally to the business in which it was engaged in Pennsylvania, Baton was not engaged in a service business or calling "within this State" under the provisions of *W.Va.* Code, 1931, 11-13-2 and 11-13-2h, as amended." *Id.* at 519 & 525, 153 S.E.2d at 522 & 526.

*Baton* is factually dissimilar in at least two material respects from the case at bar and is readily distinguishable. Taxpayer employed four persons, two of whom were West Virginia residents, full-time to solicit sales and to provide other previously described services to its West Virginia customers. Not only were taxpayers representatives employed full-time in West Virginia, but, in addition, all deliveries were made by the taxpayer's employees driving company-owned trucks. Furthermore, a very substantial portion of the gross sales of taxpayer were derived from its on-going day-to-day operations in this state. For the tax year ending August 8, 1972, gross receipts attributable to West Virginia sales, amounted to

some $4,843,700.00. During each tax year in question, 44 percent of the gross sales made in the three-state area were made in West Virginia. In no sense can the activities of taxpayer conducted in this state be characterized as meager.

Accordingly, we hold that taxpayer, during the relevant tax years, was engaging or continuing a business "within this state" within the contemplation of *Code* 11-13-2 and 11-13-2c and is therefore subject to West Virginia's Business and Occupation Tax.

## II

The troubling problems of state taxation of interstate commerce have been with us throughout the constitutional history of this country.[3] However, even in this confusing and complex area of the law this much is now certain—states may tax the privilege of engaging in interstate commerce, as it was not the purpose of the commerce clause to relieve interstate business of its obligation to pay its own way. *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S. Ct. 1076, 51 L. Ed.2d 326 (1977). In the *Complete Auto* case the Supreme Court, in an unanimous decision, expressly overruled the rule of *Spector Motor Service Inc. v. O'Connor*, 340 U.S. 602, 71 S. Ct. 508, 95 L. Ed. 573 (1951), that a state tax on the "privilege of doing business" is per se unconstitutional under the Commerce Clause, *United States Constitution*, Article I, § 8 cl. 3, when applied to interstate commerce.

Although this state's business and occupation tax is a privilege tax,[4] the taxpayer nonetheless contends the commerce clause precludes its imposition because the

---

[3] *See generally* Hellerstein, *State Taxation of Interstate Business and the Supreme Court, 1974 term: Standard Pressed Steel and Colonial Pipeline*, 62 Va. L. Rev. 149 (1976); Note, 76 W.Va. L. Rev. 380 (1973-74).

[4] In syllabus point 3 of *Bethlehem Mines Corp. v. Haden*, 153 W. Va. 721, 172 S.E.2d 126 (1969), this Court held that this state's Business and Occupation Tax was a tax on the privilege of doing business in this state and not an income tax.

tax is unapportioned and thereby subjects it to the risk of multiple or cumulative tax burdens. We disagree.

In *Standard Pressed Steel Co. v. State of Washington Department of Revenue*, 419 U.S. 560, 95 S. Ct. 706, 42 L. Ed 2d 719 (1975), the Supreme Court upheld the levy of Washington's business and occupation tax—a privilege tax measured by gross receipts against a foreign corporation. There the taxpayer, a manufacturer of industrial and aerospace fasteners (nuts and bolts generally), had its home office in Pennsylvania, one manufacturing plant there and another in California. Its principal customer in the State of Washington was Boeing Company located in Seattle. In the relevant tax years, it had one employee in Washington, an engineer, who was paid a salary and who operated out of his home near Seattle. His primary duty was to consult with Boeing regarding its anticipated needs and requirements for fasteners and to follow up any difficulties in the use of the product after delivery. The engineer was assisted by a group of engineers employed by the taxpayer who visited Boeing about three days every six weks at meetings arranged by the in-state engineer. He did not take orders from Boeing; orders were sent directly to the taxpayer. Orders accepted would be filled and shipment would be made by common carrier to Boeing direct, with all payments being made directly to the taxpayer. The in-state engineer had no secretary and had no office except for his home. He maintained an answering service in the Seattle area which was paid for by the taxpayer.

The Washington State Board of Tax Appeals found the engineer's activities were necessary to the taxpayer in making it aware of which products Boeing might use, in obtaining the engineering design of those products, in securing the testing of sample products to qualify them for sale to Boeing, in resolving problems of their use after receipt by Boeing, in obtaining and retaining good will and rapport with Boeing personnel, and in keeping the invoicing personnel of taxpayer up-to-date on Boeing's list of purchasing specialists or controlled buyers.

On these facts, the Supreme Court, relying on *Ficklen v. Shelby County Taxing District*, 145 U.S. 1, 36 L. Ed. 601 12 S. Ct. 810, (1892), held that, even though the tax on gross receipts from sales made to a local consumer may have some impact on commerce, the tax was apportioned exactly to the activities taxed, all of which were intrastate.

Applying *Standard Pressed* to the case at bar, we apprehend no reason why the constitution requires a different outcome. The taxpayer's business activities in this state in the years in issue were extensive, particularly with respect to the services rendered I.G.A. member stores. As we indicated earlier, member stores are provided the materials necessary for a successful advertising program. The franchise agreement noted earlier, and the testimony contained in the record, indicates the taxpayer provides member stores management counseling services covering virtually every aspect of a grocer's business. Significantly, the record indicates that the taxpayer's franchising enterprise was designed and marketed on the theory that it would enable small retail grocers to compete successfully in this highly competitive business with the larger retail chain store grocery businesses.

The taxpayer's West Virginia sales are thus directly and integrally related to the success of its cooperative efforts with the West Virginia merchants. Hence, we view the manifold activities of the taxpayer in this state as being essential to the establishment and maintenance of its sales. The taxpayer's employment of full-time employees within this state make possible the continuance of valuable contractual relations between it and its member stores. Though the taxpayer provides less substantial local services to non-member stores, the record does not reveal a percentage breakdown showing the portion of the total West Virginia sales which were made to non-member stores.

We are, therefore, of the opinion, just as a unanimous Supreme Court was in *Standard Pressed* that the tax in

the instant case was apportioned exactly to the activities taxed all of which were intrastate.

Moreover, the law requires a taxpayer making a multiple or cumulative tax burden claim to show it has been, in fact, taxed on the same income by two or more states. *Standard Pressed Steel Co. v. State of Washington Dept. of Revenue,* 419 U.S. 560, 42 L. Ed.2d 719 95 S. Ct. 706, (1975); *General Motors Corp. v. Washington,* 377 U.S. 436, 12 L. Ed.2d 430 84 S. Ct. 1564, (1964); *Northwestern States Portland Cement v. Minnesota,* 358 U.S. 450, 79 S. Ct. 357, 3 L. Ed.2d 421 (1959). Taxpayer's only evidence on this point was an assertion by counsel during the reassessment hearing that Virginia corporate net income tax had been paid for the tax years in issue on sales made in West Virginia. A witness for the State Tax Commissioner in response stated that taxpayer was entitled to a credit under Virginia law for taxes assessed against West Virginia sales. An examination of Virginia tax law provides no certain answer on this point, and we think it suffices to say that taxpayer has failed to demonstrate such a credit was not available.

One final point should be addressed. The taxpayer relies on the case of *Bluefield Produce and Provision Co. v. City of Bluefield,* 120 W. Va. 111, 196 S.E. 568 (1938), where the City of Bluefield sought to collect a municipal license tax measured by gross receipts. This Court held that sales having their origin within the City of Bluefield but which were consumated by delivery outside this state could not be taxed inasmuch as such sales were made in interstate commerce. *Bluefield* deals with out-of-state shipments and is obviously distinguishable from this case involving shipments of goods into this state. Moreover, it is important to realize that over the past four decades gross receipt taxes on interstate sales have generally been sustained when imposed by the state into which the goods were shipped[5] and prohibited

---

[5] *Standard Pressed Steel Co. v. Wash.,* 419 U.S. 560, 95 S. Ct. 706, 42 L. Ed.2d 719 (1975); *General Motors Corp. v. Wash.,* 377 U.S. 436, 84 S. Ct. 1564, 12 L. Ed.2d 430 (1964); *Field Enterprises, Inc. v.*

when imposed by the state from which the goods were sent.[6]

For the reasons stated in this opinion, the judgment of the Circuit Court of Mercer County is affirmed.

*Affirmed.*

---

Wash., 352 U.S. 806, 77 S. Ct. 55, 1 L. Ed.2d 39 (1956), *aff'g per curiam* 47 Wash.2d 852, 289 P.2d 1010 (1955); *Int'l Harvester Co. v. Dep't of Treasury*, 322 U.S. 340 64 S. Ct. 1019, 88 L. Ed. 1313 (1944); *Allied Mills, Inc. v. Dep't of Treasury*, 318 U.S. 740, 63 S. Ct. 666, 87 L. Ed 1120 (1943), *aff'g per curiam* 220 Ind. 340, 42 N.E.2d 34 (1942).

[6] *Evco v. Jones*, 409 U.S. 91, 34 L. Ed.2d 325 93 S. Ct. 349, (1972); *Gwin, White & Prince, Inc. v. Henneford*, 305 U.S. 434, 59 S. Ct. 325, 83 L. Ed. 272 (1939); *J. D. Adams Mfg. Co. v. Storen*, 304 U.S. 307, 58 S. Ct. 913, 82 L. Ed. 1365 (1938).