303 S.E.2d 706

**ARMCO, INC., etc.**

v.

**David C. HARDESTY, Jr., State Tax Commr., etc.**

**No. 15437.**

Supreme Court of Appeals of West Virginia.

May 25, 1983.

---

Chauncey H. Browning, Jr., Atty. Gen. and Robert Digges, Jr., Asst. Atty. Gen., Charleston, for appellant.

Spilman, Thomas, Battle & Klostermeyer and G. Thomas Battle, Charleston, for appellee.

MILLER, Justice:

This is an appeal by the State Tax Commissioner from an order of the Circuit Court of Kanawha County which set aside a business and occupation tax deficiency assessment against Armco, Inc. The circuit court concluded that the wholesale classification provisions of the business and occupation tax law (W.Va.Code, 11–13–1, *et seq.*) did not apply to the operations of certain divisions of Armco, Inc. The circuit court's conclusion was based principally on its view that these divisions did not have a sufficient business nexus with the State of West Virginia to support the imposition of the tax. On appeal the State Tax Commissioner claims that the circuit court erred in failing to find a sufficient nexus. We agree, and we reverse the decision of the Circuit Court of Kanawha County.

Armco, Inc., is an Ohio corporation qualified to hold property and do business as a foreign corporation in West Virginia. The corporation is divided into a number of divisions, four of which are relevant to the proceedings now before us: the Mining Division, the Steel Group, the Union Wire Rope Group, and the Metal Products Division. The proceeding out of which the present appeal arises involved the operations of the four dividions between January 1, 1970, and December 31, 1975.

During the period in question the Mining Division was extensively involved in mining, cleaning, and selling coal in West Virginia. The record indicates that during this period the company operated at least four mines which produced substantial amounts of coal. For instance, there is evidence that in the year 1974 alone, Armco's Number 7 Mine produced 545,288 tons of clean coal; Mine 11E produced 48,069 tons; Mine Number 8 produced 686,728 tons; and Mine Number 9 produced 257,815 tons. In the proceedings below the company did not challenge the fact that through its mining operations it had a business nexus with West Virginia.

The Steel Group of Armco produced certain steel products at nine plants located in seven states. There were no manufacturing facilities in West Virginia. This Group had no sales offices in West Virginia, but sold its products through its Cincinnati, Ohio office and its Pittsburgh, Pennsylvania office. There was evidence that the Cincinnati and Pittsburgh offices each sent two salesmen into West Virginia once every four to six weeks. The salesmen were not residents of West Virginia and had specific territories which included portions of other states. There was also evidence that one salesman went to Wheeling from Pittsburgh twice a month.

The salesmen were not authorized to accept or reject orders from West Virginia customers. Orders were forwarded to the Group's out-of-state offices where they were accepted or rejected. Goods ordered were shipped from out-of-state facilities by common carrier, and title passed to the common carrier at the out-of-state pick-up points. Follow-up calls by the salesmen were made to check customer satisfaction, and occasionally representatives of the Steel Group were called upon to investigate customer complaints and perform service work.

The Union Wire Rope Group's activities were similar to those of the Steel Division. It had a mill in Kansas City and warehouses in Ashland, Kentucky, and Pittsburgh, Pennsylvania. It maintained no inventory in West Virginia. It had no resident service or sales representatives in West Virginia, and it maintained no offices in the State. It had three salesmen—one each from Ashland, Kentucky; Pittsburgh, Pennsylvania, and Greensboro, North Carolina—who visited West Virginia once or twice a month. They took all orders subject to acceptance at Middletown, Ohio. The Group shipped goods into West Virginia in the same way as the Steel Division. The Union Wire Rope Group was not authorized to sell the Steel Division's products, and the Steel Division did not handle the Wire Rope Group's products.

Armco's Metal Products Division which produced and sold a number of construction products maintained an office in South Charleston, West Virginia. During the 1970–75 period two sales engineers and a secretary worked out of the office. The office managed the sales of all the Metal Products Division's products except metal buildings. The Division's metal buildings were sold by franchisees who were West Virginia residents operating in this State. They had agreements authorizing them to utilize the corporate name and trademarks, as well as corporate advertisements. Armco shared advertising expenses with its franchisees in order to promote sales.

On appeal Armco contends that because of the Due Process and the Commerce Clauses of the United States Constitution, the business and occupation tax cannot be imposed on the activities of the Steel Group, the Union Wire Rope Group, or on the sales of metal buildings by its Metal Products Division. Specifically, Armco claims that the operations of these divisions must be viewed separately, and, when so viewed, they do not have a substantial business nexus with West Virginia, and that the taxes imposed upon these divisions are not fairly apportioned.

I.

The Due Process Clause and the Commerce Clause of the Constitution of the United States contain standards that must be met in order to sustain state taxation of a business which conducts both local and interstate business. In *Exxon Corp. v.*

*Wisconsin Dept. of Revenue*, 447 U.S. 207, 219–20, 100 S.Ct. 2109, 2118, 65 L.Ed.2d 66, 79 (1980), the Supreme Court of the United States summarized the requirements of due process:

> "The Due Process Clause of the Fourteenth Amendment imposes two requirements for such state taxation: a 'minimal connection' or 'nexus' between the interstate activities and the taxing State, and 'a rational relationship between the income attributed to the State and the intrastate values of the enterprise.' *Mobil Oil Corp. v. Commissioner of Taxes*, [445 U.S. 425], at 436, 437 [100 S.Ct. 1223, 1231, 63 L.Ed.2d 510, 520]. See *Moorman Mfg. Co. v. Bair*, [437 U.S. 267], at 272–273 [98 S.Ct. 2340, 2344, 57 L.Ed.2d 197, 204]; *National Bellas Hess, Inc. v. Department of Revenue*, 386 U.S. 753, 756 [87 S.Ct. 1389, 1391, 18 L.Ed.2d 505, 508] (1967); *Norfolk & Western R. Co. v. State Tax Comm'n*, 390 U.S. 317, 325, [88 S.Ct. 995, 1000, 19 L.Ed.2d 1201, 1207] (1968)."

The requirements of the Commerce Clause overlap somewhat on the Due Process standards as illustrated by the Commerce Clause test given in *Department of Revenue of Washington v. Association of Washington Stevedoring Cos.*, 435 U.S. 734, 750, 98 S.Ct. 1388, 1399, 55 L.Ed.2d 682, 697 (1978):

> "The Court repeatedly has sustained taxes that are applied to activity with a substantial nexus with the State, that are fairly apportioned, that do not discriminate against interstate commerce, and that are fairly related to the services provided by the State. E.g., *General Motors Corp. v. Washington*, 377 U.S. 436 [84 S.Ct. 1564, 12 L.Ed.2d 430] (1964); *Northwestern Cement Co. v. Minnesota*, 358 U.S. 450 [79 S.Ct. 357, 3 L.Ed.2d 421, 67 A.L.R.2d 1292] (1959); *Memphis Gas Co. v. Stone*, 335 U.S. 80 [68 S.Ct. 1475, 92 L.Ed. 1832] (1948); *Wisconsin v. J.C. Penney Co.*, 311 U.S. 435 [61 S.Ct. 246, 85 L.Ed. 267, 130 A.L.R. 1229] (1940); *see Complete Auto Transit, Inc. v. Brady*, 430 U.S. [274] at 279, and n. 8 [97 S.Ct. 1076, at 1079, and n. 8, 51 L.Ed.2d 326]."

It would appear that the Due Process "minimal connection or nexus" is related to the Commerce Clause "activity with a substantial nexus with the State." Moreover, the Due Process requirement of a "rational relationship between the income attributed to the State and the intrastate values of the enterprise" is not incompatible with the Commerce Clause standard that the tax "must be fairly related to the service provided by the State." This view has some recent support from the Supreme Court itself, as illustrated by *Asarco Inc. v. Idaho State Tax Comm'n*, 458 U.S. 307, 316, 102 S.Ct. 3103, 3109, 73 L.Ed.2d 787, 794 (1982), where the Court, in a Due Process analysis, defined the "rational relationship" Due Process test in terms that are almost identical to the Commerce Clause requirement of "fairly related to the services provided:"

> "The broad inquiry in a case such as this, therefore, is 'whether the taxing power exerted by the state bears fiscal relation to protection, opportunities, and benefits given by the state. That simple but controlling question is whether the state has given anything for which it can ask return.' *Wisconson v. J.C. Penney Co.*, 311 U.S. 435, 444 [61 S.Ct. 246, 250, 85 L.Ed. 267, 270–71] (1940)."

The dissent in *Asarco* candidly recognized that decisions under both the Commerce Clause and the Due Process Clause relied on a similar analysis:

> "Our cases establish that analysis of the validity of state taxation under the Commerce Clause is similar to analysis under the Due Process Clause. The test under the Commerce Clause is whether the tax 'is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State.' *Mobil Oil Corp. v. Commissioner of Taxes, supra*, at 443, 100 S.Ct. 1223 [, at 1235, 63 L.Ed.2d 510] (quoting *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 97 S.Ct. 1076 [1079, 51 L.Ed.2d 326] (1977)." 458 U.S. at 320, n.

14, 102 S.Ct. at 3126–27, n. 14, 73 L.Ed.2d at 816, n. 14.

*See also F.W. Woolworth Co. v. Taxation and Revenue Department of New Mexico,* 458 U.S. 354, 102 S.Ct. 3128, 73 L.Ed.2d 819 (1982).

■ We conceive that for the purposes of the Due Process and Commerce Clauses of the United States Constitution, where a business has been found to have a substantial nexus with this State, and where there is a rational relationship between the tax imposed on its business activity within this State, and the protection, opportunities, and benefits afforded by the State, the tax will be upheld unless it is shown that the tax discriminates against interstate commerce or is not fairly apportioned.

The critical issue in the present case centers on Armco's claim that each of its separate divisions must be treated as a separate entity in analyzing whether the division is doing sufficient business to establish a nexus with this State to be taxed. Additionally, it contends that there is no rational relationship between the amount of tax imposed on the particular division and the protection, opportunities, and benefits the division obtains in return from this State.

Armco relies on *Norton Co. v. Department of Revenue of Illinois,* 340 U.S. 534, 71 S.Ct. 377, 95 L.Ed. 517 (1951), where the taxpayer contested an Illinois tax imposed on the selling of tangible property. That tax was measured by the gross receipts from the taxpayer's sales. The taxpayer's facility was in Massachusetts, but it maintained a sales office and warehouse in Chicago from which it made sales throughout Illinois. Its Illinois sales could be divided into three categories: (1) direct purchases at the Chicago office; (2) mail orders filled in Massachusetts and sent to the Chicago office for pickup or further re-routing to Illinois customers; and (3) mail orders filled in Massachusetts and shipped directly to Illinois customers.

The Supreme Court held that the third category of activity was purely interstate because the record did not demonstrate that there was any local activity which could be related to the interstate mail order

sales. The dissent in *Norton,* lead by Justice Clark, argued that there were local activities which related to the interstate sales. The dissent pointed out that the Chicago office offered service and technical advice on the company's products as well as handled customer complaints. Moreover, its total activities were sufficient to enable Illinois courts to obtain jurisdiction over the company and, therefore, all of these factors would permit taxation of the mail order sales.

Significantly, Justice Clark wrote for the majority in *General Motors Corp. v. Washington,* 377 U.S. 436, 84 S.Ct. 1564, 12 L.Ed.2d 430 (1964), where the issue was whether the State of Washington could impose its business and occupation tax measured by the gross wholesale prices of motor vehicles, parts and accessories shipped into the State. It was admitted that the vehicles, parts and accessories were shipped directly to dealers who had direct ordered the items from out-of-state manufacturing facilities.

The business connection of General Motors with Washington was that it had a warehouse in the state where it sold certain automobile parts. On these sales it paid a business and occupation tax. General Motors also had a resident district sales manager who worked out of his home and called on local dealers. There were service representatives who lived within the state and dealt with the dealers in regard to car servicing problems. The zone manager lived out of state but made trips into the state. In sustaining these activities as being sufficient to support the business and occupation tax on the direct out-of-state shipment of cars, parts and accessories to dealers within the state, the Supreme Court stated:

"In other words, the question is whether the State has exerted its power in proper proportion to appellant's activities within the State and to appellant's consequent enjoyment of the opportunities and protections which the State has afforded." 377 U.S. at 441, 84 S.Ct. at 1568, 12 L.Ed.2d 435.

It is apparent that General Motors contended that there was insufficient business connections in Washington as to four of its divisions: Chevrolet, Pontiac, Oldsmobile and General Motors Parts, as the Court made this comment:

"Here it is admitted that General Motors has entered the State and engaged in activities therein. In fact, General Motors voluntarily pays considerable taxes on its Washington operations but contests the validity of the tax levy on four of its Divisions, Chevrolet, Pontiac, Oldsmobile and General Motors Parts." 377 U.S. at 441, 84 S.Ct. at 1568, 12 L.Ed.2d at 435.

The Court refused to narrow its inquiry to the precise business activity done by each division, but instead looked to the total business activity done by the corporation within the state.

Further weakening of *Norton*[1] is evident in *Standard Pressed Steel Co. v. Washington Department of Revenue*, 419 U.S. 560, 95 S.Ct. 706, 42 L.Ed.2d 719 (1975), where the State of Washington again sought to impose its business and occupation tax on all sales made by Standard Steel to the Boeing Company. Standard Steel had its headquarters in Pennsylvania where it received direct orders from Boeing which it filled and shipped directly to Boeing. Its only connection with Washington was an employee who lived in the state and operated out of his home. His job was to contact Boeing regarding its product needs and to make arrangements for periodic visits to Boeing by Standard Steel's out-of-state engineers. The taxpayer's claim that its nexus was too tenuous to support the tax was rejected by a unanimous court in this fashion:

"We think the question in the context of the present case verges on the frivolous. For appellant's employee, Martinson, with a full-time job within the State,

made possible the realization and continuance of valuable contractual relations between appellant and Boeing." 419 U.S. at 562, 95 S.Ct. at 708, 42 L.Ed.2d at 722.

Of some bearing, although involving a different type of state tax, is *Exxon Corp. v. Wisconsin Dept. of Revenue, supra,* where the question involved the validity, under both the Due Process and the Commerce Clauses, of the state's apportioned business income tax. Exxon, which was admittedly a vertically integrated petroleum company, had devised an internal accounting system which separated its operations into three main units: (1) exploration and production; (2) refining; and, (3) marketing. There was no dispute that its only business activity in Wisconsin fell into the third category—marketing. Exxon contended that Wisconsin could not utilize all of its business income in apportioning the state income tax but was restricted to taxing its marketing income. However, a unanimous court rejected this contention stating:

"In order to exclude certain income from the apportionment formula, the company must prove that 'the income was earned in the course of activities unrelated to the sale of petroleum products in that State.' *Mobile Oil Corp. v. Commissioner of Taxes, supra* [445 U.S. 425,] at 439 [100 S.Ct. 1223, 1232, 63 L.Ed.2d 510, 522]. The court looks to the 'underlying economic realities of a unitary business,' and the income must derive from 'unrelated business activity' which constitutes a 'discrete business enterprise,' 455 U.S., at 441, 442, 439, 100 S.Ct., at 1233, 1234, 1232." 447 U.S. at 223–24, 100 S.Ct. at 2120, 65 L.Ed.2d at 81.

The Court went on to hold that because there were many facts showing a unitary business, including a central board of directors and operating officers as well as

---

1. There can be no doubt that the four dissenting judges in *General Motors Corp. v. Washington, supra,* viewed the case as a significant departure from the *Norton* standard as they stated:

"[T]he Court holds that the activities of the sales representatives constitute 'an in-state activity' forming 'a sufficient local incident

upon which a tax may be based.' *Ante,* at 438 [84 S.Ct., at 1566]. This decision departs from *Norton Co. v. Department of Revenue,* 340 U.S. 534 [71 S.Ct. 377 [95 L.Ed. 517]], and adopts a test there rejected." 377 U.S. at 454, 84 S.Ct. at 1574, 12 L.Ed.2d at 442.

operational interchanges between the three units, there was no unrelated business activity to require removal of the income from the other divisions.[2] There is an obvious parallel between Exxon's divisional operation claim and Armco's claim presented here that it is not subject to the business and occupation tax measured on its sales to State customers because a particular division in isolation has a limited business connection in this State.[3]

Our cases involving our business and occupation tax[4] have responded to these United States Supreme Court opinions and have taken note of what is clearly a trend on the part of the Supreme Court to permit the states to exact a fair tax on interstate enterprises. The Supreme Court's position is summarized in this statement from *Department of Revenue of Washington v. Association of Washington Stevedoring Cos.*, 435 U.S. at 748, 98 S.Ct. at 1398, 55 L.Ed.2d at 695 (1978):

> "*Complete Auto,* recognized that a State has a significant interest in exacting from interstate commerce its fair share of the cost of state government.... All tax burdens do not impermissibly impede interstate commerce." (Citations omitted)[5]

**2.** The Court in *Exxon* mentioned these operational interrelationships:

> "As has already been noted, Exxon's Coordination and Services Management provided many essential corporate services for the entire company, including the coordination of the refining and other operational functions 'to obtain an optimum short range operating program.' App. 189. Many of the items sold by appellant in Wisconsin were obtained through a centralized purchasing office in Houston whose obvious purpose was to increase overall corporate profits through bulk purchases and efficient allocation of supplies among retailers. Cf. *Butler Bros. v. McColgan,* 315 U.S. [501], at 508 [62 S.Ct. 701, 705, 86 L.Ed. 991, 996] ('the operation of the central buying division alone demonstrates that functionally the various branches are closely integrated'). Even the gasoline sold in Wisconsin was available only because of an exchange agreement with another company arranged by the Supply Department, part of Coordination and Services Management, and the Refining Department. Similarly, sales were facilitated through the use of a uniform credit card system, uniform packaging, brand names, and promotional displays, all run from the national headquarters." 447 U.S. at 224, 100 S.Ct. at 2121, 65 L.Ed.2d at 82.

**3.** We do not believe that either *Asarco, Inc. v. Idaho State Tax Commissioner, supra,* or *F.W. Woolworth Co. v. Taxation and Revenue Department of New Mexico, supra,* represents a retreat from the principles in *Exxon Corp. v. Wisconsin Dept. of Revenue, supra. Asarco, supra,* was an attempt to include within the taxable income of a non-resident corporation dividends, interest and capital gains it received from subsidiary corporations having no contact with the taxing state. *Woolworth* involved dividend income from a foreign (overseas) subsidiary. In each case, the Supreme Court held it could not be done because of the lack of a unitary business principle between the parent and its subsidiaries. The Court in *Asarco, supra,* emphasized the unitary business principle relied on in *Exxon* was lacking and stated in note 14:

> "The unitary business principle applied in *Mobil* and *Exxon* is not new. It has been a familiar concept in our tax cases for over 60 years. *See United States Steel Corp. v. Multistate Tax Commission,* 434 U.S. 452, 473 n. 25, 474, n. 26, 98 S.Ct. 799 [, 812 n. 25, 813 n. 26], 54 L.Ed.2d 682] (1978); *General Motors Corp. v. Washington* 377 U.S. 436, 439, 84 S.Ct. 1564 [, 1567], 12 L.Ed.2d 430 (1964)." 458 U.S. at 320, 102 S.Ct. at 3111, n. 14, 73 L.Ed.2d at 797, n. 14. (Other citations omitted)

Significantly, *General Motors Corp. v. Washington, supra,* as we have previously discussed, involved a business and occupation tax.

**4.** For a resume of recent State tax decisions, *see* Lathrop, *Due Process And Commerce Clause Considerations Under The West Virginia Business and Occupation And Carrier Income Taxes —J.C. Penney v. Milacron,* 85 W.Va.L.Rev. 307 (1983).

**5.** *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), overruled *Spector Motor Service, Inc. v. O'Connor,* 340 U.S. 602, 71 S.Ct. 508, 95 L.Ed. 573 (1951), which had held that a state tax on the privilege of engaging in an activity in the State could not be applied to an activity that was part of interstate commerce. In lieu thereof, *Complete Auto* substituted a functional economic test that relates to the economic activity of the business within the State and if the tax is fairly related to the benefits provided by the State. Most commentators appear to agree that the recent United States Supreme Court cases have relaxed Due Process Clause and Commerce Clause restrictions on state taxation of interstate business. *E.g.,* Hellerstein, *State Income Taxation of Multijurisdictional Corporations: Reflections on Mobil, Exxon and H.R. 5076,* 79 Mich.L.Rev. 113 (1980); Simes, *The Concept of Nexus and State Use and Unapportioned Gross Receipt Taxes,* 73 Nw.U.L.Rev. 112 (1978); Comment, *State Taxation of Interstate Business: An End to the Privilege Tax Immunity,* 29 U.Fla.L.Rev. 752 (1977);

In *J.C. Penney Co., Inc. v. Hardesty*, 164 W.Va. 525, 264 S.E.2d 604 (1979), we sustained our business and occupation tax on the taxpayer's direct mail orders and its finance charges. The taxpayer conceded that it had a substantial business nexus with this State through the operation of a number of retail outlets but contended that its business activities in regard to direct mail orders and finance charges had no independent intrastate connection. We rejected this contention stating:

> "Like the manufacturer in *Standard Pressed Steel, supra* the activities of the taxpayer are greatly facilitated by its overall operations in West Virginia; there are sufficient contacts with the State to support a tax nexus." 164 W.Va. 532, 264 S.E.2d at 610.

Of even more relevance is *Cincinnati Milacron Company v. Hardesty*, 170 W.Va. 138, 290 S.E.2d 902 (1982), where we found the taxpayer liable for a business and occupation tax on sales made by two of its operational divisions to local customers based on the fact that the company had qualified to do business in this State and had a sales engineer who spent forty-five percent of his time soliciting orders in this State. Additionally, the taxpayer would send service representatives into this State to handle particular service problems with the company's products.

We dealt with a franchise operation in *Virginia Foods of Bluefield, Virginia, Inc. v. Dailey*, 161 W.Va. 94, 239 S.E.2d 770 (1977), where a Virginia food wholesaler was taxed under our business and occupation tax on the sales made in this State. It had three sales persons who were non-residents but who solicited periodically in West Virginia. Additionally, the taxpayer had two sales representatives one of whom worked full-time in this State soliciting sales of non-food items. The taxpayer also provided certain advisory services under its franchise. Based on these facts, we upheld the imposition of the tax stating in Syllabus Point 2:

> "A foreign corporation owning no property and having no place of business in this state, which engages in substantial business activities in this state which are essential to the establishment and maintenance of sales and which make possible the continuance of valuable contractual relationships is subject to this state's Business and Occupation Tax consistent with the Commerce Clause."

In *Western Maryland Railway Co. v. Goodwin*, 167 W.Va. 804, 282 S.E.2d 240, 244 (1981), in speaking of the nexus issue, we referred to *National Geographic Society v. California Board of Equalization*, 430 U.S. 551, 97 S.Ct. 1386, 51 L.Ed.2d 631 (1977), and stated:

> "It is clear that, when a direct relationship can be demonstrated between the tax and the cost to the State of the benefits and protections it affords, there is a sufficient nexus for taxation, *see id.* at 558, 97 S.Ct. at 1391, but the opposite is not true, i.e., nexus may exist even if the in-state activities are not shown to cost the State as much as the amount of the taxes. Neither is it necessary for there to be a nexus between the particular in-state activities of the taxpayer and the activity sought to be taxed. *Id.* We conclude that purposive, revenue generating activities in the State are sufficient to render a person liable for taxes."

In the present case, we believe that where a unitary business, such as Armco, has a substantial nexus in this State through its qualifying to do business in this State, and engaging in operations such as coal mining and sales of metal products, we are not required to separate the activities of its various divisions doing business in this State and treat them separately for purposes of determining whether in isolation they have a sufficient connection to this State to warrant the imposition of a business and occupation tax. The taxpayer is a unitary business corporation conducting its business activity under one corporate umbrella. We can see no distinc-

---

Note, *State Taxation on the Privilege of Doing Interstate Business: "Complete Auto Transit, Inc. v. Brady"*, 19 B.C.L.Rev. 312 (1978).

tion between this situation and the unitary business concept used in *General Motors Corp. v. Washington, supra*, or *Exxon Corp. v. Wisconsin Dept. of Revenue, supra.*

## II.

The question of whether there is a rational relationship or fair apportionment of a tax to the local services and benefits afforded a taxpayer must also be answered by viewing the taxpayer's total activities in this State. It must be kept in mind that our business and occupation tax is composed of a number of individual taxes tied to specific business activities occurring within this State.[6] Thus, the business and occupation tax bears a fair relationship or apportionment to business activity in this State because the tax is imposed based on the value of the business activity occurring within the State. *See Virginia Foods of Bluefield, Virginia, Inc. v. Dailey, supra.* As earlier pointed out, the question of proportionality is also viewed from the prospective of the services and benefits rendered by the State to all of the activities of the taxpayer occurring within the State as illustrated by this quotation from *General Motors Corp. v. Washington*, 377 U.S. at 441, 84 S.Ct. at 1568, 12 L.Ed.2d at 435:

> "[T]he question is whether the State has exerted its power in proper proportion to appellant's activities within the State and to appellant's consequent enjoyment of the opportunities and protections which the State has afforded."

That this test has continuing validity is amply demonstrated by *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 626–27, 101 S.Ct. 2946, 2958–59, 69 L.Ed.2d 884, 900 (1981), where the Court in sustaining Montana's coal severance tax, which could equal thirty percent of the contract sales price, stated:

> "The 'operating incidence' of the tax, see *General Motors Corp. v. Washington*, 377 U.S. [436], at 440–441 [84 S.Ct. 1564,

1568, 12 L.Ed.2d 430, 435] is on the mining of coal within Montana. Because it is measured as a percentage of the value of the coal taken, the Montana tax is in 'proper proportion' to appellants' activities within the State and, therefore, to their 'consequent enjoyment of the opportunities and protections which the State has afforded' in connection with those activities. *Id.* [377 U.S. 436], at 441 [84 S.Ct. 1564, 1568, 12 L.Ed.2d 430, 435]. Cf. *Nippert v. Richmond*, 327 U.S. [416], at 427 [66 S.Ct. 586, at 591, 90 L.Ed. 760, 162 A.L.R. 844].

> "When a tax is assessed in proportion to a taxpayer's activities or presence in a State, the taxpayer is shouldering its fair share of supporting the State's provision of 'police and fire protection, the benefit of a trained work force, and "the advantages of a civilized society." ' *Exxon Corp. v. Wisconsin Dept. of Revenue*, 447 U.S. [207], at 228 [100 S.Ct. 2109, 2123, 65 L.Ed.2d 66, 84], quoting *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. [434], at 445 [99 S.Ct. 1813, 1819–20, 60 L.Ed.2d 336, 345]."

Moreover, in *Department of Revenue of Washington v. Association of Washington Stevedoring Cos., supra,* where the Supreme Court sustained the state's business and occupation tax on Stevedoring's activity and overruled two prior cases which had invalidated such a tax, the Court speaking of apportionment said:

> "When a general business tax levies only on the value of services performed within the State, the tax is properly apportioned and multiple burdens logically cannot occur." 435 U.S. at 746–47, 98 S.Ct. at 1397, 55 L.Ed.2d at 695.

Of some interest is *Mobil Oil Corp. v. Commissioner of Taxes*, 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980), where Mobil challenged Vermont's right to include in its apportioned income tax formula dividend income from its foreign subsidiar-

---

6. "W.Va.Code, 11–13–2, *et seq.*, imposes a business and occupation tax on the following activities: severance of coal and other natural resources; manufacturing; selling tangible property; public service or utility business; con- tracting; operating amusements; service business not otherwise taxed; furnishing property for hire; small loan and industrial loan business; banking and other financial business."

ies and affiliates. It contended there was no fair apportionment since none of the foreign corporations had any contact with Vermont. The Court found that under the unitary business concept the general corporation did business in the state and stated:

> "Mobil's business entails numerous 'taxable events' that occur outside Vermont. That fact alone does not prevent the State from including income earned from those events in the preapportionment tax base.
>
> "... One must look principally at the underlying activity, not at the form of investment, to determine the propriety of apportionability.
>
> "... Had appellant chosen to operate its foreign subsidiaries as separate divisions of a legally as well as a functionally integrated enterprise, there is little doubt that the income derived from those divisions would meet due process requirements for apportionability. Cf. *General Motors Corp. v. Washington,* 377 U.S. 436, 441, 84 S.Ct. 1564 [, 1568, 12 L.Ed.2d 430] (1964)." 445 U.S. at 440–41, 100 S.Ct. at 1233–34, 63 L.Ed.2d at 523.

Finally, when we look to other states that utilize a business and occupation tax, we find their decisions reject the need to make proportional their business and occupation tax because some of the events occur outside of the state. For example, in *Ramsay Travel, Inc. v. Kondo,* 53 Hawaii 419, 495 P.2d 1172 (1972), travel agents operating in Hawaii were taxed on income derived from commissions on ticket sales for transportation, lodging and sightseeing tours which activities occurred in other states and foreign countries. The taxpayer contended that the tax should be apportioned because most of the services that generated revenues upon which the tax was levied were performed outside Hawaii. In rejecting this contention, the court stated:

> "[T]hey [taxpayers] would have to show that the state has failed to exert its power of taxation in proper proportion to their activities within the state and to their 'consequent enjoyment of the opportunities and protections which the

state has afforded.' *General Motors Corporation v. Washington, supra,* 377 U.S. at 441, 84 S.Ct. at 1568. The taxpayers have failed to make any such showing." 53 Hawaii at 425, 495 P.2d at 1177.

The same result was reached in *McKinnis Travel Service, Inc. v. State,* 78 Wash.2d 229, 472 P.2d 392 (1970), and *Pan American Airways, Inc. v. Duly Auth. Gov. of Virgin Islands,* 459 F.2d 387 (3d Cir.1972).

The issue of taxation of the income of an out-of-state lessor derived from the leasing of television and film rights to local television stations was involved in *Matter of Heftel Broadcasting Honolulu, Inc.,* 57 Hawaii 175, 554 P.2d 242 (1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977). The taxpayer asserted that all of the products covered by the license agreement were made out of state. The court however found that the license agreement gave the out-of-state lessor local dominion over the telecast and this provided a sufficient nexus to permit the entire revenue from the license agreement to be subject to Hawaii's business and occupation tax. *See also Matter of Grayco Land Escrow Ltd.,* 57 Hawaii 436, 559 P.2d 264 (1977); *Collector of Revenue v. Wells Fargo Leasing Corp.,* 393 So.2d 1244 (La. 1981).

It is obvious from these decisions that a state tax cannot be defeated on Due Process Clause or Commerce Clause grounds merely because the value of out-of-state activity as it relates to the subject of the tax, whether the subject be products or services, is greater than the value of in-state activity. There is also the need to consider the protection, benefit, and opportunities afforded by the state in this overall equation relating to proportionality. Certainly, when Armco's total business activity is viewed in this State, it enjoys numerous benefits and protections afforded by the State, including fire and police protection and a host of social legislation.

### III.

Armco claims that at least as to our business and occupation tax on its whole-

sale activity there is actual discrimination against an out-of-state manufacturer. This argument is predicated on the language of W.Va.Code, 11–13–2,[7] which gives an exemption to those engaged in severing or extracting natural resources (W.Va.Code, 11–13–2a) and manufacturers (W.Va.Code, 11–13–2b) who sell their products to other manufacturers, wholesalers, or retailers. Such persons are not required to pay a further business and occupation tax on these sales. Consequently, Armco contends that as an out-of-state manufacturer which is selling products at wholesale in this State, it does not gain the benefit of this exemption and must pay a business and occupation tax on these sales under W.Va.Code, 11–13–2c.

The tax commissioner argues and, we believe correctly, that Armco's discrimination argument overlooks several key points. First, the same exemption is available for an out-of-state corporation which is engaged in manufacturing in this State when it sells its products at wholesale within the State. Therefore, the tax is not facially discriminatory. Second, the fact that Armco does not manufacture within this State some of the products that it sells in this State means that it is not subject to the business and occupation tax on manufacturing under W.Va.Code, 11–13–2b. This tax is imposed on an in-state manufacturer at a rate of eighty-eight one-hundredths of one percent of the gross proceeds of the sale. The tax rate on wholesale sales under W.Va.Code, 11–13–2c, is twenty-seven one-hundredths of one percent. Thus, a manufacturer in West Virginia pays a substantially higher tax than a wholesaler.

Where a state tax is claimed to be discriminatory, the United States Supreme Court has traditionally held that the particular tax must be surveyed along with other relevant provisions of the State's tax laws as summarized in *Maryland v. Louisiana,* 451 U.S. 725, 756, 101 S.Ct. 2114, 2134, 68 L.Ed.2d 576, 601 (1981):

> "A state tax must be assessed in light of its actual effect considered in conjunction with other provisions of the State's tax scheme. 'In each case it is our duty to determine whether the statute under attack, whatever its name may be, will in its practical operation work discrimination against interstate commerce.' *Best & Co. v. Maxwell,* 311 U.S. 454, 455–456, 61 S.Ct. 334 [, 334–335], 85 L.Ed. 275 (1940)."

Armco places particular emphasis on *Boston Stock Exchange v. State Tax Commissioner,* 429 U.S. 318, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977), where the Supreme Court struck down New York's stock transfer tax. The effect of the tax was to permit a fifty percent reduction in the tax when the stock was sold in-state and by placing a maximum tax limit of $350 when there was an in-state sale. Certain regional out-of-state stock exchanges filed suit claiming that the tax was discriminatory since it was imposed on the transfer of the stock certificates in New York but if the actual sale were made out-of-state a higher rate was charged than if the stock was sold on the New York Stock Exchange. Thus, a competitive advantage was given to the New York Exchange in violation of the Commerce Clause.

We do not believe that *Boston Stock Exchange* is controlling as it dealt with a single tax which contained rate differentials favoring in-state sales. Here, we are dealing with two separate taxes—the manufacturer's business and occupation tax with its exemption for in-state wholesale sales, and the business and occupation tax on wholesalers.

■ Our situation is more analogous to *Alaska v. Arctic Maid,* 366 U.S. 199, 81

---

7. The pertinent language of W.Va.Code, 11–13–2, in effect during the tax years involved in the present case, was:

"But any person exercising any privilege taxable under sections two-a or two-b [§ 11–13–2a or 11–13–2b] of this article and engaging in the business of selling his natural resources or manufactured products to producers of natural resources, manufacturers, wholesalers, jobbers, retailers or commercial consumers for use or consumption in the purchaser's business shall not be required to pay the tax imposed in section two-c [§ 11–13–2c] of this article."

S.Ct. 929, 6 L.Ed.2d 227 (1961), which involved a four percent tax on the value of fish caught in Alaskan waters by freezer ships and other cold storage ships and which were taken to and canned in the State of Washington. The taxpayer complained that this tax discriminated in favor of local fish processors who caught fish, and sold them on the local market and who paid a lower tax. The Court in upholding the tax stated:

> "If there is a difference between the taxes imposed on these freezer ships and the taxes imposed on their competitors, they are not so 'palpably disproportionate' (*International Harvester Co. v. Evatt,* 329 U.S. 416, 422, [67 S.Ct. 444, 447, 91 L.Ed. 390, 395]) as to run afoul of the Commerce Clause. No 'iron rule of equality' between taxes laid by a State on different types of business is necessary. *Caskey Baking Co. v. Virginia,* 313 U.S. 117, 119–121 [61 S.Ct. 881, 882–83, 85 L.Ed. 1223, 1226–27]; *Morf v. Bingaman,* 298 U.S. 407, 414, [56 S.Ct. 756, 759, 80 L.Ed. 1245, 1250]; *Capitol Greyhound Lines v. Brice,* 339 U.S. 542, 546–47 [70 S.Ct. 806, 809, 94 L.Ed. 1053, 1056–57, 17 A.L.R.2d 407]." 366 U.S. at 205, 81 S.Ct. at 932, 6 L.Ed.2d at 231.

It is important to recall that Armco as an out-of-state manufacturer of products which it sells at wholesale in this State is not subject to any business and occupation tax as a manufacturer in this State. Thus, its complaint is the same that can be made by all persons who are making wholesale sales in this State, i.e. they are taxed at the wholesale rate but a manufacturer who is taxed at a much higher rate on the value of the product is exempt when he sells the same product at wholesale. We do not believe that under *Alaska v. Arctic Maid, supra,* a showing of discrimination has been made between these two different taxes as they relate to interstate commerce.[8]

The final thrust by the taxpayer is that the exemption in W.Va.Code, 11–13–2, violates our own equal and uniform constitutional provision. W.Va. Const. art. X, sec. 1. Again, we advert to the fact that two distinct categories of business and occupation taxes are at issue: the manufacturing category which carries a much higher tax rate but permits an exemption for wholesale sales made by the manufacturer, and the wholesale tax.

Our Equal and Uniform Clause as it relates to our business and occupation tax was discussed in *United Fuel Gas Co. v. Battle,* 153 W.Va. 222, 250–51, 167 S.E.2d 890, 906 (1969), *appeal dismissed,* 396 U.S. 116, 90 S.Ct. 398, 24 L.Ed.2d 309, and this summary was given based on our earlier cases:

> "In *Arslain v. Alderson,* 126 W.Va. 880, 30 S.E.2d 533, this Court used this language: 'Unless the power of the Legislature over a subject matter is negatived by the Constitution, the Legislature has plenary power. * * *. We know of no provision of the Constitution which requires that the same rate be applied to all classes of businesses and callings on which privilege taxes are assessed. The Legislature may prescribe rates for different businesses and callings, but the rate of taxation must be uniform and equal within the classification and, if so, we see no constitutional objection thereto.' In *Appalachian Electric Power Company v. Koontz,* 138 W.Va. 84, 76 S.E.2d 863, this Court said that 'taxes need be equal and uniform only as to the same class of business,'."

It requires no great feat of imagination to conclude that the Legislature in placing the business and occupation tax on manufacturing at eighty-eight one hundredths of one percent realized that a manufacturer would also have to dispose of the product either through wholesale or retail sales and that it would be unfair to impose an additional tax on this transaction. Therefore, it created the exemption found

---

**8.** The taxpayer cites *Columbia Steel Co. v. Tax Commissioner,* 30 Wash.2d 658, 192 P.2d 976 (1948), which involved a rather similar business and occupation tax provision which the court held unconstitutional. This was before *Alaska v. Arctic Maid, supra,* which we believe to be controlling.

in W.Va.Code, 11–13–2. We believe that wholesalers who are taxed at the much lower rate of twenty-seven one hundredths of one percent cannot complain under our equal and uniform taxation principles because the Legislature has seen fit to exact a higher tax on manufacturers and exempt them from wholesale sales.[9] We, therefore, conclude that because the manufacturer's business and occupation tax and the wholesale tax involves separate classes of tax incidents that the exemption for wholesales by manufacturers does not violate the Equal and Uniform Clause of Section 1 of Article X of the West Virginia Constitution.

Under the foregoing principles, the judgment of the Circuit Court of Kanawha County is reversed and the case is remanded.

Reversed and Remanded.

[9.] Although not argued by the tax commissioner, it would seem that the Legislature also recognized that in imposing the manufacturer's tax "equal to the value of the article ... as shown by the gross proceeds derived from the sale thereof" that the very sale that would measure the manufacturer's tax could be a wholesale sale. Consequently, it would be unfair to assess in effect a manufacturing tax on this sale and at the same time assess the manufacturer with a wholesale tax.