305 S.E.2d 581

**Ralph C. MORRIS, et al.**

v.

**E.G. MARSHALL, Trustee, et al.**

**No. 15618.**

Supreme Court of Appeals of
West Virginia.

June 29, 1983.

Robert A. Yahn, Wheeling, for appellants.

Marshall & St. Clair and James W. St. Clair, Huntington, for appellees.

MILLER, Justice:

This is an appeal from the Circuit Court of Nicholas County, where the court refused to grant a permanent injunction to prevent a trustee's foreclosure sale on real property belonging to the appellants, Ralph C. and Helen C. Morris. The appellants contend that the loans they guaranteed on behalf of their corporation and on which they gave deeds of trust as security violated our Consumer Credit and Protection Act and our banking laws. We affirm the circuit court.

In 1975, when transactions between the parties began, Ralph C. and Helen C. Morris were the officers and owners of A.C. Morris Garage, Inc., a West Virginia corporation, (hereinafter Morris Garage). The corporation, located in Summersville, West Virginia, was in the business of buying and selling new and used trucks and automobiles. Ashland Finance Company of West Virginia was also located in Summersville, and was a wholly owned subsidiary of Ashland Finance Company, a Kentucky corporation.

The evidentiary record is rather sparse [1] but does reflect a number of loans obtained by the Morris Garage, beginning in November, 1975. Several of the earlier loans were repaid out of the proceeds of later loans.

The loan which appears to form the major area of default was made on December 29, 1977, in the amount of $219,293.03. Here, the lender and secured party is identified as Ashland Finance Company, and the Kentucky address is given. This loan was characterized as a "Dealer Agreement." The corporate note and a "Closed End Credit Disclosure Statement" were guaranteed by the appellants, Mr. and Mrs. Morris, and they gave three deeds of trust to secure the debt. Part of the proceeds from this loan paid off debts incurred on October 30, 1976, on November 10, 1977, and on March 17, 1976. An October 1976 Floor Plan Agreement ("Dealer Agreement") [2] was consolidated into a new Dealer Agreement, in which Morris Garage's line of credit was increased. Later, after problems arose, Ralph C. Morris pledged all of his stock in the corporation as collateral for this debt.

Two final "demand" loans were made to Morris Garage by Ashland Finance Company of West Virginia. On March 30, 1978, $150,000 was loaned, and on November 30, 1978, $22,015 was loaned.

In 1979, various problems arose in the Morris' business, and proceeds from cars sold were not paid to Ashland Finance under the Dealer Agreement. Eventually, the Morris Garage corporation became defunct. Efforts were begun to foreclose on the real estate pledged as security on the loans, and in January, 1982, the appellants

---

1. The evidentiary record consists of two depositions with various loan documents attached as exhibits. One deposition is by Mr. Richard Couchot, an executive vice president of the Kentucky corporation, Ashland Finance Company. The other is by the debtor, Mr. Ralph C. Morris.

2. It appears that the first "Dealer Agreement" under which Morris Garage borrowed money to finance its car inventory was dated March 17, 1976. This was in the amount of $150,000 and was with Ashland Finance Company of West Virginia. The "Dealer Agreement" was refinanced on October 30, 1976, and increased to $350,000 and this was with Ashland Finance Company, the Kentucky corporation. Part of this money apparently paid off earlier loans as did a loan to Morris Garage dated November 10, 1977, which was made by Ashland Finance Company, the Kentucky corporation.

brought suit to enjoin the trustee's foreclosure sale. An *ex parte* preliminary injunction was granted, but a permanent injunction was denied, which denial is the basis for this appeal. According to the deposition of the executive vice president of Ashland Finance Company of Kentucky, the amount owed by the appellants as of February 20, 1982, was $234,731.92.

The limited evidentiary record does not extensively develop the activities and interrelationship between Ashland Finance Company of West Virginia and Ashland Finance Company, the Kentucky corporation. Our main task, however, is to determine whether the trial court erred in refusing to grant the permanent injunction.

## I.

Appellants assert that Ashland Finance Company of West Virginia is a supervised lender under the provisions of W.Va.Code, 46A–1–101 *et seq.* Under W.Va.Code, 46A–1–102(44), a " 'supervised lender' means a person authorized to make or take assignments of supervised loans." In W.Va. Code, 46A–1–102(45), a "supervised loan" is defined:

> "[It] means a consumer loan made by other than a supervised financial organization, including a loan made pursuant to a revolving loan account, where the principal does not exceed one thousand five hundred dollars and in which the rate of the loan finance charge exceeds eight percent per year as determined according to the actuarial method."

The term "consumer loan" plays a vital role in the foregoing definition because the entire thrust of the West Virginia Consumer Credit and Protection Act is to protect the "consumer" as therein defined,[3] which "means a natural person who incurs debt pursuant to a consumer credit sale or a consumer loan." W.Va.Code, 46A–1–102(11).

■ Because this case involves loans, we look to the definition of a "consumer loan" to determine if it is within the ambit of the statute. W.Va.Code, 46A–1–102(14), provides:

> " 'Consumer loan' is a loan made by a person regularly engaged in the business of making loans in which:
> "(a) The debtor is a person other than an organization;
> "(b) The debt is incurred primarily for a personal, family, household or agricultural purpose;
> "(c) Either the debt is payable in installments or a loan finance charge is made; and
> "(d) Either the principal does not exceed twenty-five thousand dollars or the debt is secured by an interest in land."

In those jurisdictions which have a similar statute, courts have uniformly held that unless the loan meets the terminology of a "consumer loan," then the provisions of the act do not apply. Of some interest is *Hall v. Owen County State Bank,* 175 Ind.App. 150, 370 N.E.2d 918, 933 (1977), where the owner of a trucking business borrowed $56,000 from the bank to purchase several tractor-trailer rigs. Upon default, he contended that the bank had violated the Indiana Consumer Credit Code, but the court rejected this argument:

> "However, the statute cited by Hall, which is § 5–202(8) of the Uniform Consumer Credit Code as adopted in Indiana, is limited to consumer credit sales, IC 1971, 24–4.5–2–102 and consumer loans, IC 1971, 24–4.5–3–102. A loan for the purchase of semi-tractor trailers for use in a trucking business does not fit under the definitions of consumer transactions in IC 1971, 24–4.5–2–104(1) and IC 1971, 24–4.5–3–104(1)."

3. Some of the background of our act is set out in Cardi, *The West Virginia Consumer Credit and Protection Act,* 77 W.Va.L.Rev. 401 (1975), and in Note, *Consumer Law—The Supervised Loan in West Virginia,* 80 W.Va.L.Rev. 256 (1978). The definition section, W.Va.Code, 46A–1–102, is drawn in part from the Uniform Consumer Credit Code of 1974 § 1.301. 7

U.L.A. 627 (West 1978). However, the definition of a consumer loan under W.Va.Code, 46A–1–102(14), follows generally the definition of a consumer loan found in § 3.104 of the Uniform Consumer Credit Code of 1968. 7 U.L.A. 400 (West 1978). *See generally* Annot., *Construction and Effect of the Uniform Consumer Credit Code,* 86 A.L.R.3d 317 (1978).

**408**

An argument similar to appellants' was made in *Stricklin v. Investors Syndicate Life Insurance & Annuity Co.,* 391 F.Supp. 246 (W.D.Okl.1975), applying the Oklahoma Uniform Consumer Credit Code, Okla.Stat.Ann. tit. 14A, §§ 1–102(2)(d), 3–501(1), 3–602, 3–605, 5–107, which was also modeled after the Uniform Act. Loans were made to the plaintiffs for construction of two apartment complexes. The plaintiffs conceded that the loans were for commercial purposes, but they argued that the Consumer Credit Code applies because the Code should cover all loans made above a specified interest rate. Rejecting this argument, the court concluded that the:

> "Code does not govern large loans for a commercial purpose for the following reasons: (1) The Title of the Act, which is a part of the Act, is the Uniform *Consumer* Credit Code. (2) The underlying purpose of the Act is *inter alia,* 'to protect *consumer* ... borrowers against unfair practices' § 1–102(2)(d). (3) The scope of Article 3 is limited to all consumer loans and consumer related loans." 391 F.Supp. at 248. (Emphasis in original)

In another Oklahoma case, *Barnes v. Helfenbein,* 548 P.2d 1014 (Okl.1976), the definition of "consumer loan" was considered. The definitions of "consumer loan" under the Oklahoma statute, the Uniform Act, and the West Virginia Code are identical. The Oklahoma court found that the loan was not a "consumer loan" because it "fails to satisfy the requirement that the debt be incurred for a personal, family, household or agricultural purpose. It is obvious that the loan was made in pursuit of the borrower's commercial ventures." 548 P.2d at 1018.

In *United Kansas Bank & Trust Co. v. Rixner,* 4 Kan.App.2d 662, 610 P.2d 116 (1980), *aff'd,* 228 Kan. 633, 619 P.2d 1156, the court made this rather terse statement: "The loan was admittedly taken for a business purpose, and, therefore, would not qualify as a consumer loan under K.S.A. 16(a)–1–301(14)(a)(ii)." 610 P.2d at 119. *See also* Annot., *Construction and Effect of the Uniform Consumer Credit Code,* 86 A.L.R.3d 317, 328–29 (1978).

■ In the present case, because the loans were made for commercial purposes, the financing of an automobile dealership, they are not "consumer loans" within the purview of the West Virginia Consumer Credit and Protection Act.[4]

Appellants also argue that Ashland Finance Company of West Virginia was *only* a supervised lender under W.Va.Code, 46A–4–101 *et seq.,* and, therefore, could not have made commercial loans. We decline to address this issue for two reasons. First, the record is not developed in any detail as to the status of the institution.[5] Second, regardless of the status of Ashland Finance Company of West Virginia, appellants are seeking to void the loans based on W.Va.Code, 46A–5–101(2), or to claim excessive interest charges under W.Va.Code, 46A–4–111, or improper acquisition of a deed of trust under W.Va.Code, 46A–4–109(1). Each of these provisions applies only to a "consumer loan" and as previously pointed out, this was not a "consumer loan" under W.Va.Code, 46A–1–102(14). They point to no provision in the Consumer

4. We have limited our holding to the commercial aspect of the loan. Under the definition of a "consumer loan" set out in W.Va.Code, 46A–1–102(14), a loan is not a "consumer loan" if the debtor is an organization. An organization is defined in W.Va.Code, 46A–1–102(26), as "a corporation, government or governmental subdivision or agency, trust, estate, partnership, cooperative or association." Furthermore, W.Va. Code, 46A–1–102(14)(c) and (d), provide:

> "(c) Either the debt is payable in installments or a loan finance charge is made; and
> "(d) Either the principal does not exceed twenty-five thousand dollars or the debt is secured by an interest in land."

Obviously, some of these provisions would be applicable to the loans in this case.

5. In the deposition of Mr. Couchot, he indicated that he was not sure of Ashland Finance Company of West Virginia's status except that it was licensed as a financial institution in this State by the Banking Commissioner. At another point, he stated that at the same address, there was an Ashland Industrial Loan Company. He also acknowledged that Ashland Finance Company of West Virginia was licensed to make small loans.

Credit and Protection Act which extends coverage to a commercial loan and we are not cited any other statute that would make the loans illegal.

## II.

Appellants argue that the Ashland Finance Company, the Kentucky corporation, acted as an unauthorized bank, when it made loans to the appellants. Again, the factual record is meager as to the business structure and activities of the Kentucky corporation. It is apparently a private corporation and has, as a wholly owned subsidiary, the Ashland Finance Company of West Virginia. The Kentucky corporation does not have depositors and apparently loans money from its own resources to certain businesses. We do not believe that it constitutes a bank, at least under the meager facts presented in the record before us.

"Bank," "banking institution," and "banking business" are defined in W.Va.

Code, 31A–1–2(b) and (c),[6] by reference to the powers and functions of a bank set out in W.Va.Code, 31A–4–13 and 14. The primary functions of a bank are found in W.Va.Code, 31A–4–13, and include borrowing money, receiving deposits, making loans and other similar functions.[7] The statute does not explicitly require that all banks perform all of the functions listed, nor that the performance of any one of the functions makes a person so engaged in the banking business. Thus, an analysis of the banking statute alone is not helpful in answering the question of what is a "bank." The Uniform Commercial Code is equally unhelpful in answering this question. It merely defines "bank" as "any person engaged in the business of banking," UCC 1–201(4), but it does not define "the business of banking." [8]

Other jurisdictions have addressed the issue. In Syllabus Point 3 of *Oregon & W. Trust Inv. Co. v. Rathburn,* 18 F.Cas. 764 (No. 10,555) (C.C.D.Or.1877), the court explicitly stated that "[a] corporation en-

6. The material parts of W.Va.Code, 31A–1–2(b) and (c) are:

"(b) The words 'bank' and 'banking institution' mean a corporation heretofore or hereafter chartered to conduct a banking business under the laws of West Virginia or an association heretofore or hereafter authorized to conduct a banking business in West Virginia under the laws of the United States and having its principal office in this State and shall embrace and include a trust company or an institution combining banking and trust company facilities, functions and services so chartered or authorized to conduct such business in this State, and shall include industrial banks authorized by article seven [§ 31–7–1 et seq.], chapter thirty-one of this Code, subject to the limitations therein imposed on such industrial banks and further subject to the limitations imposed thereon in this article;

"(c) The term 'banking business' means the functions, services and activities contained, detailed and embraced in sections thirteen and fourteen [§§ 31A–4–13 and 31A–4–14] of article four of this chapter and as elsewhere defined by law."

7. W.Va.Code, 31A–4–13, in material part, provides:

"[I]t shall have the right to buy or discount promissory notes and bonds, negotiate drafts, bills of exchange and other evidences of indebtedness, borrow money, receive deposits on such terms and conditions as its officers may prescribe, buy and sell exchange, bank

notes, bullion or coin, loan money on personal or other security, rent safe-deposit boxes and receive on deposit, for safekeeping, jewelry, plate, stocks, bonds and personal property of whatsoever description and provide customer services incidental to the business of banking, including but not limited to the issuance and servicing of and lending money by means of credit cards as letters of credit or otherwise. Any banking institution may accept, for payment at a future date, drafts drawn upon it by its customers, and issue letters of credit authorizing the holders thereof to draw drafts upon it or its correspondents, at sight or on time, not exceeding one year. Any such banking institution may organize, acquire, own, operate, dispose of, and otherwise manage wholly owned subsidiary corporations for purposes incident to the banking powers and services authorized by this chapter."

8. For an article dealing with the definition of a bank by analyzing economic activities, *see* Schweitzer, *Banks and Banking—A Review of A Definition,* 94 Bank.L.J. 6 (1977). A general discussion of various types of banking institutions is given by Lapidus, *Commercial Banks and Thrift Institutions: The Differing Portfolio Powers,* 92 Banks.L.J. 450 (1975); *see also,* Grunewald, *Commercial Banking As A Distinct Line of Commerce,* 23 Wayne L.Rev. 1057 (1977); Englert, *Bank Supervision in Historical Perspective,* 34 Bus.Law. 1659 (1979).

gaged in loaning its own money upon note and mortgage is not a banking corporation." The court explained:

"Neither does it affirmatively appear whose money it loans, but the reasonable inference is, that it loans its own money, consisting of its capital stock contributed by its shareholders. Under the authorities, this is not sufficient to constitute a bank or corporation engaged in banking.... Now, if this constitutes it a banker, then every individual who loans his private funds in like manner is a banker also." *Id.* at 765.

Similarly, in *Meserole Securities Co. v. Cosman,* 253 N.Y. 130, 170 N.E. 519 (1930), the court found that "[b]usiness corporations at times lend money on real and personal security without in any form conducting a banking business." *Id.* at 520.

The most essential function of a bank is the receipt of deposits. "Having a place of business where deposits are received and paid out on checks, and where money is loaned upon security, is the substance of the business of a banker." *Warren v. Shook,* 91 U.S. 704, 710, 23 L.Ed. 421 (1875). "Strictly speaking, the term 'bank' implies a place for the deposit of money, and that is the most obvious purpose and a primary function of such an institution." 10 Am.Jur.2d *Banks* § 1 (1963). "The chief functions of a 'bank' involve the receipt of deposits from the general public, repayable to the depositors on demand or at a fixed time, the use of deposit funds for secured loans, and the relationship of debtor and creditor between the bank and the depositor." 1 Banks and Banking 6 (1973). *See also Oulton v. German Savings and Loan Society,* 84 U.S. (17 Wall.) 109, 21 L.Ed. 618 (1872); *Congress Industries, Inc. v. Federal Life Ins. Co.,* 114 Ariz. 361, 560 P.2d 1268 (1977); *State v. Jefferson Finance Co.,* 163 La. 1005, 113 So. 355 (1927); *State ex rel. Compton v. Buder,* 308 Mo. 253, 271 S.W. 770 (1925); *Williams v. Fidelity Loan & Savings Co.,* 142 Va. 43, 128 S.E. 615 (1925).

We need not for the purposes of this case determine at what point a private corporation exercising some of the powers contained in W.Va.Code, 31A–4–13, becomes a banking institution in the absence of accepting deposits. Here, we have only the lending of money from its own assets by a private corporation which has no depositors. We do not believe that this alone constitutes the banking business to make such a corporation subject to the West Virginia banking statutes. W.Va.Code, 31A–1–1 *et seq.* Because we find Ashland Finance Company not to be a bank, we do not address the issue of whether the appellants could enjoin collection of its loans because it failed to comply with the banking law.

## III.

The appellants also assert that they were entitled to enjoin the sale of the deeds of trust on their home property as they had a right to a homestead exemption under W.Va.Code, 38–9–1 *et seq.*[9] The appellee responds by asserting that there was no written claim of a homestead exemption filed as required under W.Va.Code, 38–9–3 (1931).[10] However, W.Va.Code, 38–9–3, was amended in 1974 and the filing requirement language was removed.[11] Further-

---

9. The record is unclear as to how many of the parcels included in the several deeds of trust would come within the homestead exemption definition. W.Va.Code, 38–9–2(1) (1974). It does appear, however, that the appellants' home is included.

10. The relevant language of W.Va.Code, 38–9–3 (1931), was:

"The real estate, so set apart as aforesaid, shall from the time such writing as is mentioned in the next preceding section [§ 38–9–2] is, or has been, delivered to such clerk for record, be exempt from all debts and liabilities thereafter contracted and incurred, except debts incurred for the purchase money there-of, or for the erection of permanent improvements thereon, and claims for taxes or county or district or municipal levies due thereon. But it shall not be exempt from liens and all other debts and liabilities contracted and incurred prior to the delivery of such writing for record as aforesaid."

11. W.Va.Code, 38–9–3 (1974), now provides:

"As of the effective date of this article [June 7, 1974], a homestead shall be exempt up to the value of five thousand dollars from all debts and liabilities, except debts incurred for the purchase money thereof, or for the erection of permanent improvements thereon, and

more, W.Va.Code, 38–9–1 (1974), clearly provides that the homestead exemption now arises by operation of law.[12] This section also makes the homestead exemption "subject to the provisions of section 48, article VI of the Constitution of this State." This reference to the constitutional homestead provision was also contained in the earlier statutory counterpart, W.Va. Code, 38–9–1 (1931).[13]

We also note that Section 48 of Article VI of our Constitution was amended by ratification of the voters in 1973 to increase the homestead exemption from one thousand to five thousand dollars. The language relating to "exempt from forced sales" was retained [14] as found in the earlier version of Section 48 of Article VI.[15]

In *Moran v. Clark*, 30 W.Va. 358, 4 S.E. 303 (1887), after a review of numerous existing cases relative to the "forced sale" provision, we concluded that a sale under a deed of trust was not a forced sale because a deed of trust authorized a voluntary sale and did not involve the intervention of court action by way of order or decree of sale. Consequently, we concluded in Syllabus Point 3:

"The sale of a homestead under a deed of trust, or under a decree of foreclosure of mortgage thereon, is not a 'forced sale,' within the meaning of the constitution, which exempts a homestead from a 'forced sale.'"

*Moran* is one of the leading cases on this point and has been cited in several other jurisdictions which have followed this principle. *E.g.*, *United States Building & Loan Ass'n v. Stevens*, 93 Mont. 11, 17 P.2d 62 (1932); *Karcher v. Gans*, 13 S.D. 383, 83 N.W. 431, 79 Am.St.Rep. 893 (1900). *See also White v. Rosenthal*, 140 Cal.App. 184, 35 P.2d 154 (1934); *Hicks v. Mid-Florida Production Credit Ass'n*, 374 So.2d

---

claims for taxes or county or district or municipal levies due thereon: Provided, that the exemption herein granted by operation of law shall not render the homestead exempt from liens and all other debts and liabilities contracted and incurred prior to the effective date of this article: Provided further, that with respect to a homestead exemption up to one thousand dollars perfected by execution and recordation of a written instrument as required under the former provisions of this article, such exemption shall for all purposes continue to be governed by such former provisions of this article."

12. W.Va.Code, 38–9–1 (1974), states:
"Any husband, wife, parent or other head of a household residing in this State, or the infant children of deceased or insane parents, owning a homestead *shall by operation of law* have a homestead exemption therein to the value of five thousand dollars, subject to the provisions of section 48, article VI of the Constitution of this State." (Emphasis added)

13. W.Va.Code, 38–9–1 (1931), provided:
"Any husband or parent residing in this State, or the infant children of deceased or insane parents, may hold a homestead of the value of one thousand dollars, subject to the provisions of section 48 of article VI of the Constitution of this State, upon complying with the provisions of the next section [§ 38–9–2] of this article."

14. Section 48 of Article VI provides:
"Any husband or parent, residing in this State, or the infant children of deceased parents, may hold a homestead of the value of five thousand dollars, and personal property to the value of one thousand dollars, *exempt from forced sale*, subject to such regulations as shall be prescribed by law: Provided, that such homestead exemption shall in no wise affect debts or liabilities existing at the time of the adoption of this Constitution and the increases in such homestead exemption provided by this amendment shall in no wise affect debt or liabilities existing at the time of the ratification of such amendment: Provided, however, that no property shall be exempt from sale for taxes due thereon, or for the payment of purchase money due upon said property, or for debts contracted for the erection of improvements thereon." (Emphasis added)

15. Section 48 of Article VI of the 1872 Constitution provided:
"Any husband or parent, residing in this State, or the infant children of deceased parents, may hold a homestead of the value of one thousand dollars, and personal property to the value of two hundred dollars, *exempt from forced sale* subject to such regulations as shall be prescribed by law; Provided, that such homestead exemption shall in no wise affect debts or liabilities existing at the time of the adoption of this Constitution; and provided further, that no property shall be exempt from sale for taxes due thereon, or for the payment of purchase money due upon said property, or for debts contracted for the erection of improvements thereon." (Emphasis added)

566 (Fla.App.1979); *Hart v. Sanderson's Estate*, 18 Fla. 103 (1881); *Curtis Inn v. Pratte*, 94 N.H. 380, 54 A.2d 357 (1947); *City of Dayton v. Allred*, 123 Tex. 60, 68 S.W.2d 172 (1934); *Washington Credit, Inc. v. Houston*, 33 Wash.App. 41, 650 P.2d 1147 (1982); 40 C.J.S. *Homestead* § 204 (1944).

We must conclude that when the Legislature adopted the joint resolution that altered Section 48 of Article VI of our Constitution,[16] it was aware of *Moran's* interpretation of the "forced sale" language which, in effect, exempted deeds of trust sales from the homestead exemption. By electing to retain the "forced sale" language in the amended constitutional provision, the Legislature intended to reaffirm the *Moran* holding. For this reason, we find that appellants' claim of the homestead exemption cannot be sustained because a sale under a deed of trust is not a forced sale under Section 48 of Article VI of our Constitution which brings about the right to claim the homestead exemption.

For the foregoing reasons, we affirm the judgment of the Circuit Court of Nicholas County.

Affirmed.

---

**16.** The amendment of Section 48 of Article VI of the Constitution of West Virginia originated as House Joint Resolution No. 7, 1973 Acts of the Legislature, Regular Session. It was ratified by the voters at a special election on November 6, 1973.