579 S.E.2d 543

**CITY NATIONAL BANK, Appellant Below, Appellant,**

v.

**CITY OF BECKLEY, Appellee Below, Appellee.**

No. 30678.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 21, 2003.

Decided March 14, 2003.

Gordon C. Lane, Kelly M. Young, Lane Law Firm, Herschel H. Rose, Rose & Atkinson, Charleston, for the Appellant.

Charles A. Lorensen, George & Lorensen P.L.L.C., Charleston, Mark Matkovich, City Attorney, City of Beckley, Beckley, for the Appellee.

ALBRIGHT, Justice.

Appellant City National Bank (hereinafter "City National" or the "Bank") appeals from the November 5, 2001, order of the Circuit Court of Raleigh County affirming the administrative decision of Appellee City of Beckley (hereinafter the "City") in connection with its assessment against the Bank of $281,550.82 for municipal business and occupation ("B & O") taxes. In challenging the assessment, City National argues that the circuit court wrongly interpreted a legislative rule promulgated to address the proper taxing situs where a banking business has more than one location. Based on City National's processing of the subject funds at a location formerly in Scary Creek and now in unincorporated Cross Lanes, the Bank argues that Beckley is not the proper taxing situs. Upon our review of the record in this matter in connection with the applicable statutes and regulations, we find no error, and accordingly, affirm.

## I. Factual and Procedural Background

On November 16, 2001, City National received an assessment for B & O taxes from the City of Beckley for four taxable quarters covering the period from October 1, 1999, through September 30, 2000, in the aggregate amount of $281,550.82. The Bank timely filed a petition for reassessment with the City, protesting the tax assessment and penalties based on its contention that the funds subject to the tax were not received in Beckley, but at another location outside of the City. Following an administrative hearing held on January 31, 2001, the B & O tax assessment and penalties were upheld.[1] The Bank appealed the administrative decision to the circuit court and, by order entered on November 15, 2001, the trial court affirmed the administrative decision. Through this appeal, City National seeks a reversal of the lower court's ruling requiring it to pay the subject tax assessment and penalties.

## II. Standard of Review

Our review of this matter is *de novo* given the clear questions of law that exist with regard to application of the taxing statute and regulation at issue. *See* Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995) (holding that "[w]here the issue on appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review"). Accordingly, we proceed to determine whether the lower court erred in its application of the applicable tax laws.

## III. Discussion

### A. City National's Banking Practices

City National introduces its arguments with a description of the growth it experienced beginning in the mid–1980's, which led

---

1. The administrative decision was issued on March 19, 2001.

to a major reorganization of both management and operations in 1996. At such time, many banking related functions were moved from various branch bank locations to its Central Office locations in Scary Creek and Cross Lanes. Examples of tasks that were performed at these two centralized locations [2] include loan processing, risk management, collection, generation of account statements, regulatory compliance, and investment activities.

In further explanation of how its banking business has changed, City National states that when a loan is closed at a branch location, such as in Beckley, all loan files are forwarded to and retained by personnel at the Central Office. Based on the manner in which loans, as well as numerous other banking matters are now handled at its Central Office, the Bank argues that both loan interest income and investment income "are not received at Beckley and are [therefore] not subject to Beckley B & O Tax." [3] City National concedes, however, that all trust department fees and safety deposit fees; service charges for checking accounts; NSF charges; money orders; and bank checks that are charged by its five Beckley branch locations are "received at" Beckley and, thus, fully subject to the Beckley B & O tax.

Beginning with the second quarter of 1999, City National changed the manner in which it reported taxable gross income in the banking classification for its Beckley B & O tax return. At such time, the Bank ceased reporting certain income generated from its loans and investments based on its position that such funds were not being received at Beckley, but instead at its Central Office locations where such amounts were being processed. Through this self-imposed reporting change,[4] the City realized a 90% decrease in the taxes reported by the Bank for its five Beckley branch offices in comparison to prior reporting periods.[5]

## B. History of Municipal B & O Tax

As necessary background to our resolution of this matter, we find it helpful to review the history of the municipal B & O tax. Although the state first enacted a B & O tax in 1921, the Legislature first delegated to municipalities the power to enact a municipal B & O tax in 1947. *See* 1947 W.Va. Acts, Ex.Sess., ch. 3. In 1985, the state began phasing out the state B & O tax for most business activities with an effective date of July 1, 1987, for eliminating such tax on those selected businesses and occupations. Incident to this alteration in the state tax structure, municipalities were expressly authorized to continue to assess and collect B & O taxes under West Virginia Code § 8–13–5 (1998) (Supp.2002), provided that the business activity or occupation upon which the city seeks to assess such tax was subject to the state B & O tax prior to July 1, 1987. *See Town of Burnsville v. Kwik–Pik, Inc.,* 185 W.Va. 696, 705, 408 S.E.2d 646, 654 (1991).

From its onset, the state B & O tax was recognized as a tax on the privilege of doing business in this state. *See* Syl. Pt. 1, *Hydraulics, Inc. v. Dailey,* 171 W.Va. 648, 301 S.E.2d 605 (1983) (observing that state B &

2. With the closure of the Scary Creek location, the Cross Lanes office is now the sole location where the centralized banking functions are performed.

3. *See* W.Va.R. *Taxation* § 110.26–2k.6 (1992).

4. Six months after the Bank instituted such a reporting change, it solicited an advisory opinion from the State Tax Department regarding the payment of municipal B & O taxes in view of its centralized processing location. In its advisory letter, the State Tax Department stated that because "[t]he apportionment method [adopted by the Bank]... is not based either on separate accounting or cost of doing business, we question its appropriateness and trust that it was necessary at the time it was adopted and is merely intended to be an interim measure adopted under exigent circumstances." The Tax Department recommended to the Bank that it should either utilize a separate accounting method or base the apportionment on the cost of doing business within and without each municipality where it has a bank or branch.

5. Although the amount reported by the Bank for purposes of assessing the B & O tax was less than two million dollars, the gross income reflected on certain internal documents of City National indicated that the five Beckley branch banks had an aggregate gross income of twenty-eight million dollars. The Bank took the position that twenty-six million of this amount was attributable to its Central Office location.

O tax is levied on privilege of selling or serving within this State and not on sales themselves or on income); *Virginia Foods v. Dailey,* 161 W.Va. 94, 102, 239 S.E.2d 770, 775 (1977). In *City of Morgantown v. West Virginia University Medical Corp.,* 193 W.Va. 614, 457 S.E.2d 637 (1995), we identified the various businesses once subject to this tax:

> In its most comprehensive form the statute [W.Va.Code § 11–13–1 *et seq.*] listed the following categories of businesses upon which the State could impose its B & O tax: production of coal and other natural resources, *W.Va.Code,* 11–13–2a; manufactured or compounded products, *W.Va. Code,* 11–13–2b; business of selling tangible property, *W.Va.Code,* 11–13–2c; public service or utility business, *W.Va.Code,* 11–13–2d; business of contracting, *W.Va.Code,* 11–13–2e; business of operating amusements, *W.Va.Code,* 11–13–2g; service business or calling not otherwise specifically taxed, *W.Va.Code,* 11–13–2h; business of furnishing property for hire, *W.Va.Code,* 11–13–2i; small loan business, *W.Va.Code,* 11–13–2j; banking and other financial businesses, *W.Va.Code,* 11–13–2k; an additional surtax on coal production, *W.Va.Code,* 11–13–2*l*; generation or production of electric power, *W.Va.Code,* 11–13–2m.

193 W.Va. at 616–17 n. 1, 457 S.E.2d at 639–40 n. 1 (citing statutes from 1983 Replacement Volume and 1986 Cumulative Supplement of W.Va.Code). Currently, the state levies B & O taxes on a limited number of business activities, including public service or utility businesses; gas storage; manufacturing or producing synthetic fuel from coal; and the generation or production of electric power. *See* W.Va.Code § 11–13–2d (1995) (Repl.Vol.1999); W.Va.Code § 11–13–2e (1995) (Repl.Vol.1999); W.Va.Code § 11–13–2f(2001) (Supp.2002); W.Va.Code § 11–13–2m (1995) (Repl.Vol.1999).

■ Because banking was a "business activity or occupation" for which the state previously imposed its B & O tax, municipalities are authorized under the provisions of West Virginia Code § 8–13–5 to continue to impose this type of tax. *See* W.Va.Code §§ 8–13–5; 11–13–2k (1983) (repealed W.Va. Acts 1989, 1st Ex.Sess., ch. 2). The essential nature of the banking business, as we discussed in *Morris v. Marshall,* 172 W.Va. 405, 305 S.E.2d 581 (1983), is:

> the receipt of deposits. "Having a place of business where deposits are received and paid out on checks, and where money is loaned upon security, is the substance of the business of a banker." *Warren v. Shook,* 91 U.S. 704, 710, 23 L.Ed. 421 (1875). "Strictly speaking, the term 'bank' implies a place for the deposit of money, and that is the most obvious purpose and a primary function of such an institution." 10 Am.Jur.2d *Banks* § 1 (1963). "The chief functions of a 'bank' involve the receipt of deposits from the general public, repayable to the depositors on demand or at a fixed time, the use of deposit funds for secured loans, and the relationship of debtor and creditor between the bank and the depositor." 1 Banks and Banking 6 (1973). *See also Oulton v. German Savings and Loan Society,* 84 U.S.(17 Wall.) 109, 21 L.Ed. 618 (1872); *Congress Industries, Inc. v. Federal Life Ins. Co.,* 114 Ariz. 361, 560 P.2d 1268 (1977); *State v. Jefferson Finance Co.,* 163 La. 1005, 113 So. 355 (1927); *State ex rel. Compton v. Buder,* 308 Mo. 253, 271 S.W. 770 (1925); *Williams v. Fidelity Loan & Savings Co.,* 142 Va. 43, 128 S.E. 615 (1925).

172 W.Va. at 410, 305 S.E.2d at 586.[6] While no one can dispute that the nature of the banking business has changed considerably in recent years due both to interstate banking and various technological advancements, the banking industry still revolves around the depositing and procurement of funds by its customers through either withdrawals or loans.

### C. Proper Taxing Situs

Returning to the issue at hand, we now examine whether the lower court correctly determined that the funds at issue were

---

**6.** *See* 56 W.Va. Atty. Gen. Op. 116 (Feb. 15, 1975) (stating that for municipal B & O tax purposes, banking business is determined by reference to location where deposits are received and paid out and where money is loaned upon security).

properly subject to the City's B & O tax. The circuit court, in deciding that Beckley properly assessed the Bank for B & O taxes, considered whether the tax assessment was inconsistent with the provisions of West Virginia Code § 8–13–5(e) and section 110.26–2k.6 of the Code of State Rules.

West Virginia Code § 8–13–5(e) addresses how a municipal B & O tax is to be apportioned between two or more municipalities:

Whenever the business activity or occupation of the taxpayer is engaged in or carried on in two or more municipalities of this state, the amount of gross income, or gross proceeds of sales, taxable by each municipality shall be determined in accordance with such legislative regulations as the tax commissioner may prescribe. It being the intent of the Legislature that multiple taxation of the same gross income, or gross proceeds of sale, under the same classification by two or more municipalities shall not be allowed... Nothing in this subsection (e) shall be construed as permitting any municipality to tax ... any activity that has a definite situs outside its taxing jurisdiction.

W.Va.Code § 8–13–5(e). There is no dispute that the issue of double taxation does not present itself under the facts of this case as neither Scary Creek nor Cross Lanes imposes a municipal B & O tax.[7]

Pursuant to the legislative grant of authority in West Virginia Code § 8–13–5(e), the Tax Commissioner promulgated the following regulation to resolve issues of multiple taxation involving the assessment of municipal B & O taxes: "Where a banking business or a financial organization has several business locations, a municipality shall impose its business and occupation tax only upon gross income received at banks and branch offices located within the municipality." W.Va.R. *Tax and Revenue* § 110.26–2k.6. This regulation was undisputedly aimed at the legislative objective of preventing "multiple taxation of the same gross income." W.Va.Code § 8–13–5(e). Because this case fails to present the possibility of double taxation, it is argua-

ble that the regulation applied by both the administrative law judge and the trial court is not determinative of the issue before us. However, the reasoning employed by the administrative law judge and the trial court in applying the regulatory language to decide whether Beckley "received" the funds at issue, while not determinative, is nonetheless helpful in resolving the issue of whether the subject funds were properly taxable by the City.

The critical issue to be determined is whether the funds which are the subject of the assessment resulted from an *activity*, banking in this case, that has a definite situs within Beckley. *See* W.Va.Code § 8–13–5(e). As the trial court aptly noted, "[m]unicipalities have broad discretion in imposing and administering business and occupation taxes as long as the tax does not result in (1) double taxation or (2) taxation of activities with a definite situs outside the municipality." *See id.*

The initial fact finder in this case, the administrative law judge, determined that an internal report prepared by the Bank indicated that the customer transactions giving rise to the gross income at issue occurred in Beckley based on the situs of the loan origination and the situs where the City National customers received the banking services which were the source of the funds. Similarly, the circuit court found the following with regard to the banking transactions at issue:

With respect to the loans generated in the Bank's locations in Beckley, all aspects of the relationship between debtor and creditor are created in Beckley. Conversely, the bank's activities at Scary Creek [now at Cross Lanes] are not banking activities with respect to the loans generated in the bank's Beckley locations. No Beckley loan customers were interviewed by a loan officer in Scary Creek, and no component of the relationship of debtor and creditor, as it pertains to borrowers who dealt with the Beckley locations, was created at Scary Creek. The only relationship between such a borrower and the Scary Creek loca-

---

**7.** The trial court specifically found that the apportionment mechanism contained in West Virginia Code § 8–13–5(e) was inapplicable given the

absence of the required "factual predicate" of two taxing municipalities.

tion is that the borrower was told to send his loan payments to the Scary Creek location for processing.

The trial court, in addressing the Bank's argument that the "received at" regulatory language of section 110.26–2k.6 prevents the City from taxing the subject funds, observed:

> With respect to the loans generated at the banks['] locations in Beckley, the Scary Creek location is not a bank or a branch office; it is merely a processing location. . . . During the period in question, the Scary Creek location was not a bank or a branch office for customers of the Bank's Beckley locations. Customers from Beckley did not travel to Scary Creek for any banking activity. Loan payments made by mail were sent to the Scary Creek location, and loan payments that were delivered by customers to the Bank's Beckley locations were then forwarded by mail or courier to the Scary Creek location for further processing and data entry. Nothing that occurred at Scary Creek played any part in the creation of this income.

Addressing the Bank's assertion that the location where it "received" the loan payments controlled the issue of whether the City could tax the income generated from those payments, the trial court reasoned:

> [T]he activities conducted at the Scary Creek location are an integral and inseparable part of the work made necessary by the loans generated at the Bank's Beckley locations. If those loans had not been generated in Beckley, the Bank's activity at Scary Creek, to the extent that it is associated with Beckley loans, would not occur, and this income would not have been generated at all.

Rather than focusing on the whether the funds at issue were physically received at a location within Beckley, the trial court properly determined that the underlying banking activity—in this instance a loan issuance—was the critical factor in resolving the issue of proper taxing situs.

In focusing almost exclusively on the argument that the funds at issue are not subject to the Beckley B & O tax due to the fact that a Central Office location handles the processing of those funds, the Bank has lost sight of the underlying nature of the B & O tax. Because the tax is a tax on the privilege of doing business, the location of where the subject funds are processed is, in our judgment, an extraneous matter that does not bear on the fundamental issue of the banking business for which the tax is being levied. Although gross income is the measure by which the tax is assessed, it is not what is being taxed—the privilege of conducting the business of banking in the locale of Beckley is the taxable event. *See Dailey*, 171 W.Va. at 649, 301 S.E.2d at 605, syl. pt. 1.

■■■ In syllabus point five of *Kwik*, we held that "[i]n the construction of tax laws, we still must apply our general rules of statutory construction with a view toward upholding the legislative intent. Strict construction should not be used to defeat tax legislation that is reasonably clear in its meaning." 185 W.Va. at 697, 408 S.E.2d at 647. In a recent use tax decision, we noted that "[i]t is the substance, not just the form, of a commercial transaction that determines its tax consequences." Syl. Pt. 6, *CB & T Operations Co., Inc. v. Tax Comm'r*, 211 W.Va. 198, 564 S.E.2d 408 (2002). The Bank seeks to elevate the processing of loan and interest payments to be tantamount to banking itself. To accept the Bank's argument would require us to adopt an altered view of the nature of the banking activity that is subject to the municipal B & O tax at issue. *See Hukle v. City of Huntington*, 134 W.Va. 249, 255, 58 S.E.2d 780, 783 (1950) (recognizing that "[i]t is a well-nigh universal principle that courts will determine and classify taxation on the basis of realities"). As we discussed above, the essence of what it means to hold yourself out as a bank is still the location where depositors go to make deposits, withdrawals, obtain credit, and secure loans. Consequently, the decision of a bank to process and handle paperwork and payments resulting from the needs of its customers in a centralized manner does not alter the essence of the banking business which is subject to a municipal business and organization tax for the privilege of conducting business within a particular city. *See Morris*, 172 W.Va. at 410, 305 S.E.2d at 586.

Since the basis of the B & O tax is the taxable activity of banking, the Bank's emphasis on where the funds at issue are transferred for processing purposes necessarily skirts the legislative objective of taxing the privilege of doing business in a particular locale and not the funds themselves. Local governments are highly dependent on the revenues generated by the municipal B & O tax. Without question, a budgetary loss of almost three hundred thousand dollars for a one-year period was a significant decrease in revenues for the City. Setting aside the economic realities, however, the Bank's decision to centrally process payments cannot be used as a mechanism to avoid the assessment of taxes by the City. For the privilege of conducting the business of banking within its locale, the Legislature has authorized the City to assess a municipal B & O tax. Absent that legislative authority, Beckley would be powerless to assess such a tax. Given the grant of this authority, however, Beckley clearly has the right to assess such a tax on banks, including City National, that choose to operate within its boundaries and consequently realize profits from the funds deposited and loans procured by its residents. Accordingly, we hold that for purposes of assessing a municipal business and occupation tax, the taxability of loan interest realized by a bank or other financial institution is to be determined in reference to where the loan was obtained by the customer because that is where the banking activity was conducted which resulted in the generation of the income at issue.

In addition to loan interest, the Bank also singled out investment income for purposes of challenging the assessment of the City's B & O tax. In its decision, the trial court viewed income from investment activity and interest income on loans as categorically indistinct for analytical purposes, based on the administrative trial judge's merged treatment of such income[8] and the fact that "[n]either party challenged this treatment in the briefs filed in this Administrative Appeal." As the amici observe in their brief, the Bank clearly attributes the investment income at issue to its Beckley branches in its internal operating reports. Given the fact that the Bank routinely assigns or allocates its investment income to its branch banks, it appears logical to assume that such income was realized as a consequence of the banking activity conducted by that particular branch bank. Consequently, the same reasoning discussed above in addressing why interest income on loans is properly viewed as income generated by the banking office from which the customer procured the loan is similarly applicable to identifying the proper taxing situs for interest income on investments. Given the established method used by the Bank to allocate funds used for investment purposes among various banking offices, there does not appear to be any difficulty in determining the specific location from which the investment income originated. Accordingly, we hold that for purposes of assessing a municipal business and occupation tax, the taxability of investment income realized by a bank or other financial institution is to be determined based upon the banking location to which those income earning investments are attributed or assigned by the bank, in this case, by means of internal reports generated for operational purposes.[9]

Based on the foregoing, the decision of the Circuit Court of Raleigh is hereby affirmed.

Affirmed.

---

8. In grouping these two types of income at the administrative level, the administrative judge observed that the Bank "did not argue that its non-loan investment activities are funded in some different manner than in prior periods," and further observed that the Bank's investments "are 'funded' by local customer deposits."

9. We wish to acknowledge the forthrightness of the Bank with regard to its candid disclosures concerning the investment income at issue and how such income is allocated to specific branches for internal banking purposes. In basing our decision in this case in part on the existence of certain internal documents that attribute income to specific banking locations, we wish to make clear that we are neither inviting nor condoning any type of creative accounting or reporting that would seek to or result in the inappropriate allocation of income to a specific situs to avoid the assessment of B & O taxation.